UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

MATTHEW DWIGHT THOMPSON,　　　)
　　　　　　　　　　　　　　　　)　　6: 15-cv-01313-AA
　　　　　　　　　Petitioner,　　)
　　　　　　　　　　　　　　　　)
　　　　v.　　　　　　　　　　　)
　　　　　　　　　　　　　　　　)
JEFF PREMO, Superintendent,　　)　　OPINION AND ORDER
Oregon State Penitentiary,　　　)
　　　　　　　　　　　　　　　　)
　　　　　　　　　Respondent.　　)

　　　Ellen Pitcher
　　　6312 SW Capital Hwy, Suite 187
　　　Portland, OR 97239

　　　Michael R. Snedeker
　　　4110 SE Hawthorne Blvd
　　　Portland, OR 97214-5246

　　　　　　Attorneys for Petitioner

　　　Ellen F. Rosenblum
　　　Attorney General
　　　Timothy A. Sylwester
　　　Ryan P. Kahn
　　　Assistant Attorneys General
　　　Department of Justice
　　　1162 Court Street NE
　　　Salem, Oregon 97301

　　　　　　Attorneys for Respondent

1 – OPINION AND ORDER

AIKEN, District Judge.

Petitioner brings this capital habeas corpus action pursuant to 28 U.S.C. § 2254 in which he challenges his convictions and death sentence for aggravated murder. For the reasons set forth below, the Court denies Claim Three and Claims Five through Fifteen of the Petition for Writ of Habeas Corpus [43] and dismisses them with prejudice.

I.    **Factual Background**

The facts regarding the aggravated murders and other crimes for which petitioner was convicted and sentenced to death are set forth in *State v. Thompson*, 328 Or. 248, 971 P.2d 879 (1999), *cert. denied*, 527 U.S. 1042 (1999). Briefly, about 10:30 p.m. on November 18, 1994, petitioner and Paul Whitcher entered the Driftwood Tavern in Portland and ordered a pitcher of beer. They approached Debra Oyamada who was sitting at a video poker machine and asked her if she was from "the 'samurai family'" or "from samurai blood." She responded that she was. Petitioner pursued the conversation, but Oyamada said she did not want to talk and turned her back on him because she thought his questions were weird and that he was "overbearing." Petitioner persisted, telling her, "I need to know about it. I'm a warrior and I want to know about this." Oyamada again told him she did not want to talk. Petitioner sat down next to her and she told him that he was sitting in someone else's seat. Petitioner got up and started to the door. As he and Whitcher walked, Oyamada's husband, Andrew McDonald, approached and said, "Please leave her alone, she doesn't want to talk about it." Pat Disciasio, the bartender, directed petitioner and Whitcher to leave. When they did not go immediately, he said, "Good night, you guys," and pointed to the door. As they left, one of them said, "I feel like killing somebody tonight." They

stood outside the tavern and petitioner told Whitcher, "I'm going back in there and kick that guy's ass."  Petitioner said, "If we do this, you know, we're going to jail."

Five to ten minutes after leaving the tavern, petitioner ran back in alone, grabbed McDonald from behind, began striking him, and dragged him outside.  Oyamada followed and tried to pull petitioner off McDonald.  Petitioner turned to her, hitting her in the head, throwing her on the ground, and stabbing her in the head and neck.  Bill Jones also came from inside the tavern and grabbed petitioner.  Petitioner stabbed him six times.  Petitioner fled and ambulances came and took McDonald, Oyamada, and Jones to the hospital.  McDonald died from multiple stab wounds.

Meanwhile, petitioner and Whitcher walked to his grandmother's house, where petitioner lived.  Petitioner introduced Whitcher to his grandmother and she went to bed.  About 1:30 a.m. she woke to a lot of noise and went downstairs.  She found Whitcher picking up broken glass and petitioner cleaning grape juice off the rug.  She asked Whitcher to leave.  Petitioner stated he was going to see him home and they left.  When petitioner returned a short time later, his  grandmother was still cleaning up the spilled juice.  He told her that he would clean it up and directed her to go to bed.  Before she fell asleep she heard the washing machine running.

About 1:30 a.m. Sally Wooley heard loud, angry male voices outside her home and called "911".  She reported that a man was lying face down in the street and that another man wearing a plaid shirt, had kneeled over him, rolled him partially onto his side, rummaged through his pockets, then ran away.  Police identified the man on the street as Whitcher.  He had been stabbed sixteen to twenty times and was dead.  One of his pockets had been turned inside out.

About 2:00 a.m., police found petitioner walking nearby, smelling of alcohol and acting nervously and evasively. His shoes were untied and although it was cold he wore no socks. One of his eyes was swollen. Police thought he might have witnessed Whitcher's stabbing and questioned him. He denied having been in an altercation, stated that he lived with his grandmother nearby, but gave them his mother's address, and denied that he had ever been arrested or that he was on probation. After a record check revealed this was false, police took him into custody.

Eventually police contacted petitioner's grandmother at her home. She invited them in and gave them permission to look around. She led them to the washing machine in the basement and opened the lid. There was blood on the outside of the machine and on the washed clothing inside, which petitioner's grandmother identified as belonging to petitioner. An expert concluded that DNA recovered from the machine, jeans, a shoelace and a sock was consistent with Whitcher's DNA.

Police returned later with a search warrant and found no weapons. They returned a second time that day and, with petitioner's grandmother's consent, searched the basement. This time a detective found a bloody knife on a cross beam and a blood-smeared wallet inside a wood stove. An expert concluded that blood found on the knife and wallet matched Whitcher's blood type.

## II.    Procedural Background

Petitioner was tried, convicted and sentenced to death in 1996. On direct review, the Oregon Supreme Court affirmed the convictions and death sentence. *Thompson*, 328 Or. 248 (1999). The United States Supreme Court denied his petition for writ of certiorari on June 24, 1999. *Thompson v. Oregon*, 527 U.S. 1042 (1999).

Petitioner next filed for post-conviction relief ("PCR") in state court. *Thompson v. Palmateer*, Marion County Circuit Court Case No. 99C15857. The PCR court held an evidentiary trial and denied relief on petitioner's Third Amended Petition for Post-Conviction Relief. DR 18-11, pp. 5-6, Respondent's Exhibit ("Ex.") 404. The Oregon Court of Appeals affirmed on appeal and the Oregon Supreme Court ultimately denied review. *Thompson v. Belleque*, 268 Or. App. 1, 341 P.3d 911 (2014), *rev. denied*, 357 Or. 300, 353 P.3d 595 (2015).

On December 1, 2016, petitioner timely filed a Petition for Writ of Habeas Corpus. The Petition [43] raises seventeen (17) claims and numerous sub-claims. In an Order dated January 16, 2018, the Court dismissed with prejudice Claims One, Two, Four and Seventeen on the basis that those claims are procedurally defaulted and petitioner failed to demonstrate entitlement to excuse their default. In addition, the Court dismissed Claim Sixteen without prejudice as premature. The parties have briefed the merits of the remaining claims.

## III. <u>Applicable Law</u>

### A. <u>Standards for Habeas Relief</u>

An application for writ of habeas corpus shall not be granted unless adjudication of the claim in state court resulted in a decision that was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court's findings of fact are presumed correct and petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

A state court decision is "contrary to . . . clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that a materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Under the "unreasonable application" clause, a federal habeas court may grant relief "if the state court identifies the correct legal principle from [the Supreme Court's] decisions, but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable. *Id*. at 409-10. A federal habeas court reviews the state court's "last reasoned decision." *Ylst v. Nunnemaker*, 501 U.S. 797, 804, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991).

"[R]eview under §2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2001)(holding that "the record under review is limited to the record in existence at that same time, i.e., the record before the state court."); *see Murray v. Schriro*, 745 F.3d 984, 998 (9th Cir. 2014)("Along with the significant deference AEDPA requires us to afford state court decisions, AEDPA also restricts the scope of the evidence that we can rely on in the normal course of discharging our responsibilities under §2254(d)(1)."). This evidentiary limitation is applicable to §2254(d)(2) claims as well. *Gulbrandson v. Ryan*, 738 F.3d 976, 993 n.6 (9th Cir. 2013). Therefore:

> for claims that were adjudicated on the merits in state court, petitioners can rely only on the record before the state court in order to satisfy the requirements of

§2254(d). This effectively precludes federal evidentiary hearings for such claims because the evidence adduced during habeas proceedings in federal court could not be considered in evaluating whether the claim meets the requirements of §2254(d).

*Id*. at 993-94.

**B.  Ineffective Assistance of Counsel**

For petitioner's claims of ineffective assistance of trial  counsel, the Supreme Court has established a two-part test to determine whether a petitioner has received ineffective assistance of counsel.  First, the petitioner must show that his lawyer's performance fell below an objective standard of reasonableness.  *Strickland v. Washington*, 466 U.S. 668, 686-87, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  Due to the difficulties in evaluating counsel's performance, courts must indulge a strong presumption that the conduct falls within the "wide range of reasonable professional assistance."  *Strickland*, 466 U.S. at 689.

Second, the petitioner must show that his lawyer's performance prejudiced the defense. The appropriate test for prejudice is whether the defendant can show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id*. at 694.  A reasonable probability is one which is sufficient to undermine confidence in the outcome of the trial.

When considering ineffective assistance of counsel claims under 28 U.S.C. §2254(d), "it is the habeas applicant's burden to show that the state court applied *Strickland* to the facts of his case in an objectively unreasonable manner."  *Woodford v. Visciotti*, 537 U.S. 19, 25, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002)(per curium).  Moreover, where a state court has adjudicated an ineffective assistance of counsel claim on the merits, a habeas court's review of a claim under the *Strickland* standard is "doubly" deferential.  *Harrington v. Richter*, 562 U.S. 86, 105-06, 131 S.Ct.

770, 178 L.Ed.2d 624 (2011); *Knowles v. Mirzayance*, 556 U.S. 111, 123, 129 S.Ct. 1411, 173 L.Ed.2d 251 (2009).

## IV.   Discussion

### A.   Third Claim:  Ineffective Assistance of Counsel In Relying on Petitioner to Choose Jurors in Voir Dire While Making it Effectively Impossible for Him to Do So

Petitioner alleges that trial counsel[1] deprived him of a meaningful opportunity to participate in voir dire when they required him alone to review the questionnaires of more than fifty potential jurors, failed to seek additional time for him to complete this review, and failed to obtain and provide him with available juror photos to aide him in this task.  He further alleges that the trial court's refusal to grant a continuance, despite his having suffered a broken nose and having to take prescription pain medication, compounded counsel's voir dire error.[2]  Petitioner contends that due to the above circumstances he could not assist counsel in determining when to exercise his for-cause and peremptory challenges.

Respondent maintains that petitioner cannot overcome the PCR court's denial of relief on this ineffective assistance claim under either *Strickland's* deficient performance or prejudice prongs and insists that no relevant authority supports petitioner's position that he need not prove prejudice.

---

[1] Lynne Dickison (lead counsel) and Jon Martz (co-counsel) represented petitioner at trial.
[2] The Court rejects petitioner's attempt to bootstrap this trial court error claim--faulting the trial court with denying his request for a continuance after he suffered a broken nose at the hands of another inmate and which required him to take prescription pain medication--to the subject ineffective assistance of counsel claim.  As the PCR court indicated, these allegations and claims are discreet.  In any event, as petitioner concedes, counsel sought a continuance due to petitioner's injuries.

Examining the last reasoned state-court decision, the PCR court made the following relevant findings of fact and conclusions of law:

Claim 4. Voir Dire

Petitioner claims that Trial Counsel failed to prepare for voir dire and to permit Petitioner to participate in the process of jury selection. While Petitioner does testify that the process was hurried: "We rushed right through it", and "…we didn't have time enough to read the questionnaires" (Id. at 76, lines 19-20, Ex. 11, page 76, line 15), he does not distinguish the source of the time constraints, i.e., whether Counsel had any actual fault in connection therewith. We do have the credible testimony of Co-Counsel: "As I recall, Ms. Dickison and I did all we could to prepare for voir dire. We reviewed the juror packets in as much time as Judge Redding gave us".

Regardless, Petitioner's own testimony is contrary to his claim regarding his lack of participation in jury selection: "They just brought it to me and **pretty much put it all on my shoulders** (Emphasis added, Ex 11, page 77, lines 5-7), and: "They put it all on my shoulders …" (Ex. 11, page 77, lines 16-17). Trial Counsel support that conclusion in the more positive light that Trial Counsel permitted Petitioner to participate in voir dire and when Petitioner offered advice as to specific jurors, Counsel followed his advice (Ex 116, Martz Affidavit, page 4, par. 8).

There is no credible evidence to support a conclusion that any act or failure of Trial Counsel in voir dire resulted in any harm or prejudice to the outcome of the proceeding. Petitioner agrees that he does not know if any juror was unfair or even if any juror would have voted for the death penalty "no matter what" (Ex. 11, page 81). Indeed, even Petitioner's post conviction counsel acknowledges at Petitioner's deposition:

> "We don't have any way of establishing that the process of voir dire resulted in a jury that voted for the death penalty simply because Counsel didn't properly voir dire" (Ex. 11, page 81)."

Petitioner's position all but forecloses this claim. And, even the crux of Petitioner's belief seems to belie an actionable claim. Petitioner's reason for believing the jury was unfair is "I don't think a fair jury would have gave me the death penalty" (Ex. 11, page 79, lines 23-24). This claim fails.

DR 18-8, pp. 36-37, Ex. 395.[3]

_____

[3] These findings of fact and conclusions of law are found in Honorable Don A. Dickey's 60-page

<u>Analysis</u>

Effective assistance of counsel is required during voir dire. *Brown v. Jones*, 255 F.3d 1273, 1278-79 (11th Cir. 2001). However, "[a]n attorney's actions during voir dire are considered to be matters of trial strategy[.] A strategic decision cannot be the basis for a claim of ineffective assistance unless counsel's decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness." *Miller v. Webb*, 385 F.3d 666, 672-73 (6th Cir. 2004)(internal citations omitted); *see also Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001)("Counsel is also accorded particular deference when conducting voir dire. An attorney's actions during voir dire are considered matters of trial strategy.").

> On the constitutional level, "[a] person charged with a felony has a fundamental right to be present at every stage of the trial … [including] the voir dire and empaneling of the jury." *Campbell v. Wood*, 18 F.3d 662, 671 (9th Cir. 1994)(en banc)(citing *Illinois v. Allen*, 397 U.S. 337, 338, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) and *Diaz v. United States*, 223 U.S. 442, 455, 32 S.Ct. 250, 56 L.Ed. 500 (1912)). "The right to presence derives from the Confrontation Clause of the Sixth Amendment and the Due Process Clauses of the Fifth and Fourteenth Amendments.: *Id.* (citing *United States v. Gagnon*, 470 U.S. 522, 526, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985)(per curiam)).

*U.S. v. Reyes*, 764 F.3d 1184 (9th Cir. 2014); *see also, Fisher v. Roe*, 263 F.3d 906, 914 (9th Cir. 2001)(quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105-06 (1934))(A "defendant has a right to be present and participate if his presence 'has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge.'"). The manner in which voir dire is conducted, however, is committed to the broad discretion of the trial court. *See Skilling v. United States*, 561 U.S. 358, 386, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010)("Jury selection, we have repeatedly

---

letter dated May 19, 2008 which he sent to the parties and later attached to the court's October 15, 2008 Findings of Fact and Conclusions of Law with amendments and additions. DR 18-9, pp. 1-34, Ex. 402.

emphasized, is particularly within the province of the trial judge.")(internal quotes omitted). Moreover, while challenges for cause are constitutionally guaranteed under the Sixth Amendment, the Supreme Court has "reject[ed] the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury." *Ross v. Oklahoma*, 487 U.S. 81, 88, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988); *see also Rivera v. Illinois*, 556 U.S. 148, 157, 129 S.Ct. 1446, 173 L.Ed.2d 320 (2009)("[T]here is no freestanding constitutional right to peremptory challenges.").

Here, in what the PCR court characterized as "credible testimony," petitioner's attorney recalled that he and co-counsel did all they could to prepare for voir dire in the time the court allowed, including reviewing the juror packets. Moreover, the PCR court found that counsel permitted petitioner to participate in voir dire and followed his advice regarding specific jurors. Indeed, petitioner confirms that he was present and participated in voir dire. Nevertheless, he suggests that counsel heaped *all* of the responsibility for reviewing juror questionnaires on his shoulders, failed to seek adequate time for him to complete this review, and failed to secure available juror photographs to assist him in the task.

The record refutes these allegations. In discussing the process and schedule for voir dire with prospective jurors, Judge Redding noted, "We would do it as a group in order to get the lawyers an opportunity to ask you some questions and get information beyond the juror questionnaires, **which they've had over the weekend**." DR 18-16, p. 13, Ex. 458 (emphasis added). Furthermore, petitioner's counsel, Ms. Dickison stated, "All the lawyers have received copies of the questionnaires that you filled out. * * * I have had a chance to review your questionnaires and, of course, there's some questions I'd like to ask, as well as questions that [the]

State will want to ask." *Id*. at 18. Defense counsel and counsel for the State also referred extensively to the juror questionnaires during voir dire, including in asking questions related to juror responses in the questionnaires related their views about the death penalty. Petitioner's presence during these exchanges further undermines his argument that he was unable to assist in determining when to exercise his for-cause and peremptory challenges, in part because review of the questionnaires is just one of a number tools petitioner and counsel had to assist them in making these decisions.

Accordingly, in light of the PCR court's above findings and the Court's review of the voir dire transcripts, petitioner cannot show that counsel's failure to seek additional time for review of the questionnaires, even without the benefit of available juror photos, was such a poor decision that it permeated the trial with obvious unfairness. As noted above, this Court must "indulge a strong presumption" that counsel's handling of voir dire fell within the wide range of reasonable professional assistance.

In addition, the Ninth Circuit has largely settled the question of whether a defendant's right to be present during a critical stage, such as voir dire, is subject to harmless error review. Even in the wake of *United States v. Gonzalez-Lopez*, 548 U.S. 140, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006), where the Court held that the "erroneous deprivation of the right to counsel of choice … qualifies as 'structural error,'" the Ninth Circuit continues to apply its precedents holding that erroneous deprivation of the defendant's right to be present is subject to harmless error review. *U.S. v. Reyes*, 764 F.3d 1184 n.4 (9th Cir. 2014)(citing *U.S. v Marks*, 530 F.3d 799, 812 (9th Cir. 2008)("If the denial of the right to be present rises to the level of a constitutional violation, then 'the burden is on the prosecution to prove that the error was harmless beyond a reasonable

doubt.'"(quoting *Rosales-Rodriguez*, 289 F.3d 1106, 1109 (9th Cir. 2002)); *Hovey v. Ayers*, 458

F.3d 892, 903 (9th Cir. 2006)("[A]s we recently held in *Campbell v. Rice*, a violation of the right

to be present is trial error, subject to harmless error review.").   Critically too, in *Weaver v.*

*Massachusetts*, 137 S.Ct. 1899, 198 L.Ed.2d 420 (2017), the Court held that *Strickland* is the

proper standard for addressing a Sixth Amendment public-trial violation raised in a state collateral

proceeding as an ineffective assistance of counsel claim and requires a showing of prejudice even

though the high Court classifies unwarranted courtroom closures as a structural error that generally

entitles a defendant to automatic reversal.

Petitioner relies primarily on *Gomez v. United States*, 490 U.S. 858, 109 S.Ct. 2237, 104

L.Ed.2d 923 (1989), to support his contention that any deficient performance on counsel's part in

this context constitutes structural error, and therefore, he does not have to show he was prejudiced

by counsel's actions.   Briefly, *Gomez* held that district judges are not permitted under the Federal

Magistrates Act to assign to magistrates the task of presiding over jury selection in a felony trial

without the defendant's consent.  As is relevant here, the Court emphasized the importance of jury

selection as "the primary means by which a court may enforce a defendant's right to be tried by a

jury free from ethnic, racial, or political prejudice, or predisposition about a defendant's

culpability." *Id*. at 873 (internal citations omitted).  It also rejected the government's argument that

any error was harmless because the defendants alleged no specific prejudice as a result of the

Magistrate conducting the voir dire examination.  Critically, however, in concluding that harmless-

error analysis did not apply, the Court stressed a defendant's basic right to have all critical stages

of a criminal trials conducted by a person with jurisdiction to preside.

Here, petitioner alleges counsel failed to ensure that he could fully participate in voir dire via examination of the juror questionnaires. In addition to arising in the context of an ineffective assistance of counsel claim, which requires a showing of prejudice, *Gomez*'s main holding -- that a critical stage of trial may not be conducted by a person without jurisdiction to preside, is inapplicable to this claim. A judicial officer with proper jurisdiction presided over petitioner's voir dire and jury selection. Petitioner was present for this critical stage, his counsel had access to the juror questionnaires for a reasonable amount of time, reviewed them, questioned potential jurors about them, and allowed petitioner to participate in voir dire.

Accordingly, petitioner cannot show that the PCR court's denial of both the deficient performance and prejudice prongs of this ineffective assistance of counsel claim was contrary to, or involved the unreasonable application of, *Strickland*, or that it was based on an unreasonable determination of the facts. This claim is denied.

**B.** **Fifth Claim: Petitioner had an Irreconcilable Conflict with His Counsel, Effectively Receiving No Representation at All as His Attorneys Acted as Agents of the Prosecution, Resulting in Constructive Denial of His Right to Counsel**

Petitioner contends that his counsel's representation of him was "rife with antipathy" and that they failed to perform basic tasks of building a defense, failed to develop a productive relationship with him, and failed to disclose the fractured and dysfunctional nature of their relationship to the court when petitioner repeatedly asked for their removal and appointment of new counsel. He argues further that counsel were so ineffective in their unwarranted pursuit of competency and insanity issues that they acted as agents of the prosecution.

By all accounts, petitioner became dissatisfied with counsel early on. Initially, he was not satisfied with Philip Agrue as the investigator in his case. Apparently, he was put off by Mr.

Agrue's casual dress and grooming and what he perceived to be a lack of professionalism. Petitioner asserts that he directed his counsel to hire an investigator not affiliated with Mr. Agrue and that Ms. Dickison promised to do so. Notably, Mr. Agrue stated that in their initial meetings, petitioner questioned Ms. Dickison's record as an attorney and whether she had adequate time to handle his case. Mr. Agrue characterized him as "pretty unstable." Ms. Dickison hired Shirley Beers in January 1995.[4] Petitioner maintains that Ms. Beers was an inexperienced investigator who had never worked a murder case, let alone a death penalty case, and that she was professionally affiliated with Mr. Agrue--a fact that petitioner insists his counsel hid from him causing further deterioration of their relationship when he found out months later.[5] And finally, despite petitioner filing bar complaints and a Section 1983 action against counsel, he insists they refused to recuse themselves.

Respondent contends that petitioner cannot show that the state courts unreasonably applied clearly established federal law or made unreasonable determinations of the facts in rejecting his claim that due to "an irreconcilable conflict" with trial counsel he was constructively denied

---

[4] Petitioner references statements by Mr. Agrue suggesting that it would not bother him if petitioner received the death penalty. As noted, however, counsel hired Ms. Beers to largely replace Mr. Agrue early on in the case. The Court's review of the record does not support petitioner's contentions that his remaining defense team, including Ms. Beers, shared Mr. Agrue's unsympathetic sentiments and that they colored petitioner's entire defense from investigation through the penalty phase. Indeed, petitioner acknowledges that following Ms. Beers' appointment he had productive interviews with her. This belies his assertion that Mr. Agrue permanently tainted petitioner's relationship with his defense team.

[5] In her PCR deposition, Ms. Dickison stated that petitioner did not think that she or Mr. Martz were doing an appropriate job for him and that this colored his view of everyone they put in from of him. And while she testified that she thought Ms. Beers was put on the case because petitioner did not like Mr. Agrue, she did not recall hiding Ms. Beers' association with Mr. Agrue from petitioner or petitioner complaining about their connection when he learned of it. DR 18-13, pp. 28-32, Ex. 444.

counsel. Specifically, respondent maintains that the Court must presume the correctness of the PCR court's findings: (1) that it was petitioner's voluntary decision not to get along with counsel; and (2) that he would have had similar communication problems with any attorney.

In denying this claim, the PCR made the following findings of fact and conclusions of law:

> To the extent that Petitioner claims that the record in this post conviction proceeding establishes a basis for his claim, this Court reviews the record. It is noted that Petitioner appears to assume that because Petitioner has "severe personality conflicts" with his attorneys, that this must be a fault or error of Trial Counsel which "result[ed] in a breakdown of the attorney-client relationship." Petitioner has it wrong in at least two ways:

> 1. It was Petitioner's own voluntary decisions and behavior, not based upon objective reasonable grounds, that caused any lack of communication. Petitioner's expert, Dr. Janzer noted that Petitioner himself could not articulate any basis for his complaints against Counsel (Dr. Janzer's letter report to Counsel (Ex 26)). Dr. Janzer opined that Petitioner would have the same problem with any attorney (Id. at 2). Based upon the record herein including those facts, this Court agrees.

> 2. Even if there was a complete breakdown in an attorney-client relationship, as long as the attorney investigates the facts including possible witnesses and defenses, files appropriate motions, prepares for direct, cross and rebuttal, calls appropriate witnesses and otherwise puts on an adequate case constitutionally, a petitioner could not successfully show a constitutional deficiency in the attorney. In other words, just because the attorney and client do not get along, regardless of the degree of that failure, such does not establish a denial of the constitutional right to counsel.

DR 18-8, p. 26, Ex. 395.

### Law on Constructive Denial of Counsel

> A defendant has a Sixth Amendment right to conflict-free representation. *United States v. Moore*, 159 F.3d 1154, 1157 (9th Cir. 1998). Not every conflict between a defendant and counsel, however, implicates the Sixth Amendment. *See Schell v. Witek*, 218 F.3d 1017, 1027 (9th Cir. 2000). As the Supreme Court has explained, the right to counsel does not guarantee "a right to counsel with whom the accused has a 'meaningful attorney-client relationship'" *Morris v. Slappy*, 461 U.S. 1, 3-4, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983). Nevertheless, where a court "compel[s] one charged with [a] grievous crime to undergo trial with the assistance of an

attorney with whom he has become embroiled in [an] irreconcilable conflict [it] deprive[s] him of the effective assistance of any counsel whatsoever." *Brown v. Craven*, 424 F.2d 1166, 1170 (9th Cir. 1970). Thus, a reviewing court must assess the nature and extent of the conflict and whether that conflict deprived the defendant of representation guaranteed by the Sixth Amendment. *Schell*, 218 F.3d at 1027.

* * *

We have applied the constructive denial of counsel doctrine to cases where the defendant has an irreconcilable conflict with counsel, and the trial court refuses to grant a motion for substitution of counsel. *See United States v. Nguyen*, 262 F.3d 998, 1003-04 (9th Cir. 2001); *United States v. Adelzo-Gonzalez*, 268 F.3d 772, 778-79 (9th Cir 2001). The test for determining whether the trial judge should have granted a substitution motion is the same as the test for determining whether an irreconcilable conflict existed. *United States v. Moore*, 159 F.3d 1154, 1159 n.3 (9th Cir. 1998). The court must consider: (1) the extent of the conflict; (2) whether the trial judge made an appropriate inquiry into the extent of the conflict; and (3) the timeliness of the motion to substitute counsel. *Id*. at 1158-59.

*Daniels v. Woodford*, 428 F.3d 1181, 1196-98 (9th Cir. 2005).

With regard to the extent of the conflict, "[w]here a criminal defendant has, with legitimate reason, completely lost trust in his attorney, and the trial court refuses to remove the attorney, the defendant is constructively denied counsel [] even where the breakdown is a result of the defendant's refusal to speak to counsel, unless the defendant's refusal to cooperate demonstrates "unreasonable contumacy." *Id*. at 1198 (citations omitted). Moreover, "[e]ven if [trial] counsel is competent, a serious breakdown in communications can result in an inadequate defense" *Id*. (citations omitted).

<u>Analysis</u>

Examining the relevant factors, it is evident that the timeliness of petitioner's motions for substitution weighs in his favor. Neither party contends, nor did the trial court find, that petitioner's motions for substitution, which he raised months before trial, were untimely.

However, the factors related to the extent of the conflict and whether the trial judge made an appropriate inquiry into the conflict weigh against petitioner. Ultimately, petitioner cannot rebut by clear and convincing evidence the findings by the PCR court either that any lack of communication between him and his counsel stemmed from his own decisions and behavior and were not based on objectively reasonable grounds; or, critically, that petitioner would have the same problem with any attorney. The record reveals that petitioner struggled to articulate what his complaints about his counsel involved and his version of events did not match that of counsel. Moreover, petitioner's discussions with the trial court and examination of the March 16, 1995 letter that he wrote Ms. Dickison wherein he demanded that she immediately file some nineteen (19) motions, suggest his conflict with counsel stemmed in part from his dissatisfaction with counsel's trial strategy. [6] Notably, disagreements over trial strategy "do not rise to [the] level of a complete breakdown in communication." *See Stenson v. Lambert*, 504 F.3d 873, 886 (9th Cir. 2007)(citation omitted). Finally, the record supports petitioner's counsel's representation that communication with petitioner, while certainly difficult, was up and down and that they attributed much of their difficulty with him, not to an irreconcilable conflict, but to his mental health issues.

Petitioner alleges that counsel were not candid with the court in disclosing the true nature and severity of their conflict with him. In addition, he points to what he insists was counsel's deception in hiring Ms. Beers despite her affiliation with Mr. Agrue and to Ms. Beers lying to him

---

[6] Indeed, while petitioner expressed dissatisfaction with her representation and advised her that he intended to file a complaint based on the judge's refusal to appoint substitute counsel, the bulk of his three-page letter centered on his demands that she file and keep him advised of numerous motions, including a Motion to Rely on Defense of Not Guilty by Reason of Insanity, Motion for Mental Health Evaluation of Defendant, Notice of Intent to Introduce Expert Testimony (Temporary Insanity and Extreme Emotional Disturbance), and Motion and Order for Transport for Psychiatric/Psychological Evaluation. DR 18-12, pp. 91-93, Ex. 438.

about having met with his father, to bolster his assertion that the conflict was due to counsel's betrayal of him and not to his own unreasonableness. He also references the fact that he cooperated with Ms. Beers over a two-month period and provided her with details about his background and the subject crimes to prove that it was not until he learned of his defense team's dishonesty that he understandably stopped communicating with them. Whatever the merit of this narrative, however, petitioner's cooperative period with Ms. Beers also plausibly supports counsel's representation to the court that they believed they could keep his case on track and continue to represent him despite the difficulty in their relationship. As petitioner acknowledges, Ms. Beers filed lengthy investigative memos of her interviews with him on January 23, 1995, January 27, 1995, February 8, 1995 and February 26, 1995 wherein they discussed petitioner's background as well as his memories of the homicides. Based on their observations of and interactions with petitioner, counsel viewed his refusal to communicate with them and his filing of bar complaints and a civil rights action against Ms. Dickison (both eventually dismissed as lacking merit), as a sign of his ongoing and potentially deteriorating mental health challenges.

The trial court evaluated and denied petitioner's motions for substitution of counsel on March 14, 1995, April 21, 1995 and May 22, 1995. While there appears to be no transcript memorializing the April 1995 hearing, in taking up petitioner's May 1995 motion, the court noted that it saw "nothing new," and that it had on a couple of occasions (presumably on March 14, 1995 and April 21, 1995), gone over petitioner's complaints item by item and found them not to be a legal basis to grant his request for substitution of counsel. DR 18-22, p. 87, Ex. 486.

Specifically, during the March 14, 1995 hearing, Ms. Dickison reported that petitioner had refused to see her and Ms. Beers a few days earlier. She disclosed that he indicated on March 8,

1995 that he felt she was doing nothing on his case, that he was seeing no progress and was dissatisfied with how she was preparing his case for trial. She further noted that he had relayed these concerns to the Oregon State Bar who found no basis for opening a file regarding any complaint about her. She then stated as follows:

> I would indicate to the Court, as I've indicated earlier, that in discussions with Mr. Thompson, defense team Mr. Martz and I and the investigator staff, are well satisfied that things are proceeding correctly. We don't feel the communications have deteriorated to the point where we cannot represent Mr. Thompson.
>
> Of course, we do want to allow Mr. Thompson to relay his concerns to the Court and allow the Court to make a decision.

The court then invited petitioner to tell him what his problems were. The resultant exchange ensued:

> THE DEFENDANT: Your Honor, they've provided ineffective counsel.
>
> THE COURT: You have to get very specific about that.
>
> THE DEFENDANT: She, it's, it's not working out, Your Honor.
>
> THE COURT: All right. Give me some examples.
>
> THE DEFENDANT: They've, they've done nothing, in almost five months, they've done nothing on my case. I, I still haven't gotten all my police reports. I haven't, I got some, some copies that weren't copies right from the first police reports that I have –
>
> THE COURT: We're talking about police reports? What else?
>
> THE DEFENDANT: She doesn't return my phone calls.
>
> THE COURT: On how many occasions has this happened?
>
> THE DEFENDANT: Every, every occasion – well, not every occasion but it takes her two or three weeks to return her phone calls.
>
> THE COURT: Anything else?

THE DEFENDANT: Yeah. There are a few motions that I feel should be passed and there was a bail hearing because I was uninformed. I'm really, really concerned about these, these indictments. I feel that something should be done about those indictments.

THE COURT: Like what?

THE DEFENDANT: Well, I mean, they're prejudicing the Grand Jury with these indictments.

THE COURT: I'm sorry?

THE DEFENDANT: They're prejudicing the Grand Jury with these indictments. These indictments are unbelievable. I mean, she, they haven't attempted to try to lower the indictments to try to get me to be released from custody. There's – their strategies to fighting this case are a lot different from, you know, from a defense, from my defense.

THE COURT: All right. You mentioned motions and went over those very quickly. What kind of motions do you think they should be filing?

THE DEFENDANT: Well, all types of motions.

THE COURT: Can you give me some idea of what you have in mind?

THE DEFENDANT: I'm not sure, Your Honor.

DR 18-22, pp. 72-74, Ex. 486.

At this point, the court reminded petitioner that he had been very insistent that his bail hearing be terminated and that the judge had reviewed his rights with him and carefully explained them to him. *Id*. at 74-75.[7] Petitioner also advised the court the fact that he filed a federal civil rights action against his counsel.

---

[7] Part way through petitioner's bailing hearing on February 1, 1995 his counsel asked to approach the bench with opposing counsel. In a chambers conference, noting that petitioner had "been in a tenuous mental state since arrest" she advised the court that he requested that they waive further bail hearing and acquiesce to no bail. The court personally confirmed with petitioner that this was his intention, that he had discussed it with his counsel, that he had no questions for the court about his waiver, and that he understood he could not request a release hearing at a later date.

The court then turned to counsel to discuss petitioner's complaints. Ms. Dickison assured the court that she was forwarding petitioner copies of the police reports as she received them and had kept him apprised when she learns new reports are in the pipeline. With regard to phone calls, Ms. Dickison said that to her knowledge, with the exception of the last two-and-a-half weeks when she was sick and unable to talk, she was not aware of a problem with calls. She also reported that Ms. Beers and Mr. Martz were in contact with petitioner at this time. Mr. Martz interjected at this point to say that about a week ago he and Ms. Beers met for several hours with petitioner at the jail and had a detailed discussion, and that he had a brief conversation on the phone with him later that same day. With regard to motions, Ms. Dickison stated that she has repeatedly explained to petitioner that there is a date and time for motions that will be heard before trial and that they cannot attack the indictment until their scheduled court date. Martz indicated that he has met with petitioner and discussed how the charges can be attacked through demur and various motions. He also noted that discovery is ongoing and they did not yet have a full set of the police reports because the State was still investigating. Ms. Beers indicated that she visits with petitioner about every week and a half and makes telephone contact with him. The court then asked petitioner is there is anything else. He responded that he felt he has to defend himself against the district attorney and his own attorneys.

In denying his request for new counsel, the court told petitioner that it is understandable that he would be concerned about his upcoming trial and his representation, but that he has not given the court any legal reason to change his counsel because the points he raised are matters that are being addressed by his attorneys. The judge further opined that, overall, petitioner's

DR 18-22, pp. 50-53, 62, Ex. 486.

discontentment appears to arise out of his perception that people do not respond immediately or quickly to his calls or questions. He assured petitioner, among other things, that his counsel are qualified and have met the criteria for defending this type of case, that they have demonstrated ability, dedication and skill in his courtroom and around the courthouse, that he is being well represented, that they are doing the things necessary and appropriate for his case, and that the judge's impression is that they both have an interest in him and are concerned about his welfare.

In the hearing on May 22, 1995, the court briefly took up petitioner's latest request for substitution of counsel. Petitioner contended that: (1) he and his counsel had suffered a severe client/attorney relationship; (2) irreparable damage had been done and the only solution is to sever—he thinks their refusal to excuse themselves by itself should render his request valid; (3) counsel were not working in his best interests; (4) he could not prepare a defense because there was no harmony; and (5) he had no trust and lots of animosity.   As referenced above, the court determined that there were no new arguments and denied his motion to change counsel. The court then turned to the question of whether petitioner was able to aid and assist in his defense and petitioner called Dr. Janzer to testify about his examination and testing of petitioner. In the course this testimony, Dr. Janzer stated that petitioner, while dissatisfied with current counsel, could not tell him how he would expect a new attorney to be different. Dr. Janzer also opined that giving him new attorneys would not change his psychopathology--suggesting that new counsel would not solve the problem petitioner was having with current counsel. *Id*. at 133-34.

The Court's independent review of this record reveals that the trial court carefully listened to petitioner's complaints about his counsel and made every attempt to ease his concerns. In so doing, it made an appropriate inquiry into petitioner' claims of conflict. *See Daniels*, 428 F3d at

1200 ("A conflict inquiry is adequate if it eases the defendant's dissatisfaction, distrust, and concern and provides a sufficient basis for reaching an informed decision.")(internal quotes and brackets omitted). Moreover, given Dr. Janzer's opinion that petitioner would have these struggles with any attorney, coupled with the trial court's firsthand experience with petitioner's irrationality (as evidenced by his complaint about counsel and the bail hearing) and counsel's representations that they were continuing to do the necessary work and felt that their relationship with petitioner, while difficult, was not unworkable and/or that his mental health issues were the source of the difficulty[89], the court's refusal to grant petitioner's motions for substitute counsel was not unreasonable. Critically too, while petitioner faults counsel with lack of candor with the court, the record reveals that counsel implored the trial court to hear petitioner's complaints and he was given ample opportunity to advise the court as to source of his dissatisfaction. Nevertheless, he did not notify the court of the things he now contends were the source of his "understandable" distrust of his counsel and defense team, namely, that Ms. Dickinson lied to him about Ms. Beers affiliation with Phil Agrue or that Ms. Beers lied to him about having met with his father.

For his part, Martz acknowledged that their relationship with petitioner was difficult, admitting that "at times" he would tell them that he would like new counsel and that other times

[8] In her PCR deposition, Ms. Dickison characterized petitioner as a high maintenance client needing more information and more reassurance and involvement. She reported that their communication was off and on, stating, "Matt periodically talked to us a lot. On other occasions he would not talk to us. The overriding theme I recall was anger from him." DR 18-13, p. 44, Ex. 444. She acknowledged that there were serious communications problems from the beginning and she did not know why she did not have good rapport with petitioner. She suggested it might be bad chemistry, but noted that Dr. Janzer opined it would have happened to anyone. She also believed petitioner was mentally ill. *Id*. at 86.

[9] The Court views petitioner's arguments that Ms. Dickison's heavy caseload and personal financial difficulties improperly influenced her decision to remain on petitioner's case as relevant context for this claim. However, they do not sway the Court to reach a different conclusion here.

he would refuse to talk to the defense team.  Mr. Martz also noted that petitioner had particular problems with Ms. Dickison so he handled most of the communications with him.  He averred that he is uncertain whether petitioner's relationship would have been different with any other attorney and he too believed petitioner was mentally ill.  DR 18-32, pp. 198-99, Ex. 501.

Petitioner takes particular issue with the PCR court's above finding that even if there was a complete breakdown in communication, so long as counsel put on a constitutionally adequate case, there can be no ineffective assistance of counsel.  Petitioner insists that this is contrary to *Daniels* and *United States v. Nguyen*, 262 F.3d 998, 1003-04 (9th Cir. 2001)(holding that a defendant is denied his Sixth Amendment right to counsel when forced to go to trial with counsel with whom his is dissatisfied and with whom he will not "in any manner whatsoever" communicate).[10]  As a general assertion, petitioner's argument is well taken.

However, in accordance with *Daniels*, where, as here, the PCR court found that any conflict stemmed from petitioner's decisions and behavior and were not based on objectively reasonable grounds, there is no constructive denial of counsel, *i.e.* where petitioner did not, with legitimate reason, lose trust with his counsel.  428 F.3d at 1198; *see also, Plumlee v. Masto*, 512 F.3d 1204, 1211 (9th Cir. 2008)(defendant not entitled to a different lawyer based on his unjustified willingness to cooperate with his appointed attorney).  While petitioner insists that his rejection of counsel was justified, for the reasons discussed above, the Court concludes that he has not rebutted by clear and convincing evidence the PCR court's findings that it was petitioner's voluntary

---

[10]  In contrast to the facts in *Nguyen* where the attorney himself acknowledged that communication had broken down completely, the record here does not support a finding that petitioner refused to communicate with either of his appointed counsel "in any manner whatsoever."

decision, not based on objectively reasonable grounds, that caused any lack of communication between him and his counsel and that such challenges would have arisen with any appointed counsel.

In addition, and largely for the reasons discussed at length in Claim Six below, the Court concludes that counsel's decision to move for a competency hearing and to file a notice of intent to rely on an insanity defense, do not support a finding that petitioner effectively received no counsel or that his attorneys acted as agents of the prosecution.

Based on the foregoing, petitioner cannot demonstrate that the PCR court's denial of this claim alleging that the trial court's refusal to grant his motions for substitution of counsel based on an irreconcilable conflict between petitioner and his counsel amounted to constructive denial of counsel, was contrary to, or involved an unreasonable application of, clearly established Federal Law as determined by the Supreme Court, or that it was based on an unreasonable determination of the facts. Accordingly, petitioner is not entitled to habeas relief on this claim.

C.   **Sixth Claim: Petitioner's Counsel Rendered Ineffective Assistance When They Pursued Mental Health Issues Including Competency and Insanity without Any Reasonable Basis to Believe Petitioner's Mental State Supported these Issues, Thus Allowing the State's Experts to Extensively Evaluate Him and Obtain Statements Outside the Presence of Counsel**

According to petitioner, his counsel pursued a competency evaluation of him even though they had no evidence that the statutory grounds necessary for such a determination were met. And later, when the court eventually determined that petitioner was competent to proceed, his counsel filed a notice of intent to rely on various statutory defenses based on mental disease or defect or extreme emotional disturbance. Again, petitioner alleges that counsel filed this notice despite having no expert opinion supporting it. Consequently, petitioner argues that he was subject to two

extensive evaluations by Dr. Hulteng at the Oregon State Hospital which resulted in a 28-page report, wherein petitioner made extensive statements about the murders outside the presence of his counsel and enabled Dr. Hulteng to provide damaging testimony in the penalty phase of the trial.

As an initial matter, respondent contends that petitioner's allegation faulting counsel with filing a notice of intent to rely on an insanity or mental disease or defect defense is procedurally defaulted because he did not present it to the Oregon Supreme Court. And with regard to the competency hearing allegation, he maintains that petitioner never disputed the PCR courts underlying findings of fact relevant to this claim and contends that petitioner has not demonstrated that the Oregon Court of Appeals' denial of this claim was contrary to, or involved an unreasonable application of, federal law.

### Ineffective Assistance of Counsel for Filing Notice to Rely on Insanity or Other Mental Disease or Defect

Petitioner suggests that he presented this subclaim to the Oregon Supreme Court via an ineffective assistance of appellate counsel claim alleging appellate counsel failed to raise a Sixth Amendment claim of constructive denial of trial counsel. Clearly, however, presentation of an ineffective assistance of appellate counsel claim does not suffice to fairly present a related ineffective assistance of trial counsel claim. Petitioner acknowledges as much with his admission that "there is no independent claim in the Petition for Review specifically focusing on Mr. Thompson's attorneys causing him to be evaluated pursuant to the Notice for Insanity Defense; in fact, that was not an independent claim at all in the state post-conviction proceedings." Response [87], p. 17. Nevertheless, he suggests that *Martinez v. Ryan*, 566 U.S. 1 (2012) provides a mechanism for overcoming this subclaim's default and calls for the Court to review it *de novo*.

The Court notes that under the heading of "Constructive Denial of Right to Counsel" in his Third Amended Petition for Post-Conviction Relief, petitioner alleged that trial counsel made the prejudicial error of "fil[ing] a notice of intent to rely upon an insanity defense resulting in petitioner's transfer to the state mental hospital where prosecution expert witness, Hulteng, evaluated him and later provide[d] testimony against him in his penalty phase." DR 18-6, pp. 217-18, Ex. 375. To the extent that PCR counsel raised the subject ineffective assistance claim then, *Martinez* does not apply and cannot excuse its default. *See Davila v. Davis*, 137 S.Ct. 2058 (2017) (*Martinez* only applies to the performance of PCR counsel during the initial level of collateral review and does not apply to claims involving alleged errors of PCR appellate counsel).

Alternatively, even assuming *Martinez* applies, petitioner does not analyze its requirements. In considering whether the underlying claim is a substantial one, the Court's review of the record reveals that: (1) counsel had expert evidence confirming that petitioner suffered from a "personality disorder or mental illness"[11]; (2) early on in the case petitioner was amenable to pursuing an insanity defense—even demanding that counsel pursue such a defense at one point; and (3) counsel believed that such a defense was his best and only viable option. In an affidavit prepared during petitioner's PCR proceedings, Mr. Martz averred:

---

[11] While petitioner insists that his counsel had no expert opinion to support their filing a notice of intent to rely on a mental defense, the Court notes that in the May 22, 1995 aid-and-assist hearing, Dr. Janzer confirmed that it was his opinion that petitioner had some form of either personality disorder or mental illness that prevented him form aiding and assisting in his defense. DR 18-22, p. 142-43, Ex. 486. And again, on November 1, 1995, when the parties reconvened to take up the pending aid-and-assist motion, Dr. Janzer stated that his opinion at the time of the May 1995 hearing was that petitioner was "unable to aid and assist because of a mental illness," and that he still held that view even after reviewing additional records and in light of Dr. Hulteng's report. *Id*. at 166. As summarized by Mr. Martz, Dr. Janzer found that petitioner suffered from a paranoid personality disorder so severe it is pathological and has a psychotic component to it. *Id*. at 245-48.

Regarding paragraphs 19(d) and (e), I agree that petitioner was sent to the Oregon State Hospital for an evaluation. As I recall, before petitioner went there, we first had him evaluated by Dr. Norman Janzer for purposes of a possible mental defense. Dr. Janzer determined that petitioner suffered from a mental disease or defect that caused him to be aggressive to other people. After we received Dr. Janzer's report and discussed options with petitioner, we filed a motion to raise a guilty-except-for-insanity defense. Pursuant to discovery rules, the state had a right to have petitioner examined by his own expert. It exercised that option, and Dr. Hulteng examined petitioner. Ms. Dickison went with petitioner to the examination and instructed petitioner not to talk about the specifics of the case and to take the Fifth Amendment if any answer would be incriminating. Sometime after that evaluation, against our advice, petitioner filed several motions to withdraw guilty-except-for-insanity defense. As I recall, Ms. Dickison and I made known to the court that we believed this was a bad idea, as petitioner did not have any other viable defenses. The trial court granted petitioner's motion. In addition, Judge Jones, who presided over several pre-trial hearings, rejected out attempts to revive that defense.

DR 18-32, pp. 198-99, Ex. 501.

Based on the foregoing, the Court concludes that petitioner cannot meet his burden under *Martinez* to show that the underlying ineffective assistance of counsel claim is a substantial one, and that PCR counsel were ineffective in a failing to raise it. Accordingly, the Court denies this subclaim on the basis that it is procedurally defaulted and petitioner has not shown entitlement to excuse the default.

<u>Ineffective Assistance for Pursuing Issue of Competency</u>

In the last reasoned state court decision, the Oregon Court of Appeals affirmed the PCR court's denial of this subclaim as follows:

***[O]ur task is to determine whether petitioner established, by a preponderance of the evidence, that trial counsel's decision to initiate the aid-and-assist proceeding—viewed in the light of trial counsel's perspective at the time that they made the decision—constituted a failure to exercise reasonable skill or judgment. *Montez*, 355 Or. at 7, 322 P.3d 487; *Lichau*, 333 Or. at 359-60, 39 P.3d 851. We conclude that he did not.

Although petitioner correctly notes that Janzer had not reached a definitive diagnosis of petitioner at the time that trial counsel requested the aid-and-assist

hearing—and that the ultimate diagnosis of petitioner did not constitute a "mental disease or defect" under Oregon's statutory definition of that term—those facts alone were insufficient to carry petitioner's burden of proof. Viewed from trial counsel's perspective at the time that they made their decision to request a hearing, *viz.*, in the context of petitioner's impending criminal trial, we conclude that trial counsel could, in a reasonable exercise of professional judgment, conclude that an aid-and-assist hearing was necessary. As the post-conviction court found, trial counsel was faced with a client who "refused to cooperate" in the preparation of his defense nearly from the outset of their representation of him. The expert whom trial counsel retained produced a report concluding that petitioner's "long-standing psychopathology prevents him from emotionally appreciating his legal situation and from assisting his attorney in preparing his legal defense." Further, although Janzer had not reached a definitive diagnosis of petitioner, no diagnosis was forthcoming because petitioner had stopped cooperating with Janzer. Added to that is the very real time pressure that trial counsel faced: Petitioner's trial was scheduled to begin in early July 1995, and Janzer's report was produced in mid-May 1995, approximately six weeks before the scheduled trial date. Viewed in that light, trial counsel's decision to act to ensure that petitioner was capable of aiding and assisting in his defense represented a reasonable exercise of professional judgment.

*Thompson*, 268 Or.App. at 13-14.

In her deposition, Ms. Dickison noted that in a death penalty case she always has her client evaluated by a psychiatrist and she indicated that petitioner's crime particularly led her to question his mental ability because the murders were so senseless. Moreover, she averred that she thought petitioner was mentally ill and ordered the aid-and-assist evaluation because she was worried about communication from petitioner and his refusal to talk to her.

As the Oregon Court of Appeals indicated above, counsel could reasonably rely on Dr. Janzer's assessment, even if incomplete and lacking a definitive qualifying diagnosis at the time of the competency hearing, to support her decision to pursue such hearing to examine petitioner's ability to aid and assist in his defense. *See Harris v. Vasquez*, 949 F.2d 1497, 1525 (9th Cir. 1990)("It is certainly within the 'wide range of professionally competent assistance' for an attorney to rely on properly selected experts"). This was particularly true given the looming trial date,

petitioner's sporadic refusal to communicate with the defense team, and even his resistance to productively cooperate with Dr. Janzer.

Based on the foregoing, petitioner cannot show that the Oregon Court of Appeals' denial of this ineffective assistance of counsel subclaim surrounding counsel's pursuit of a competency hearing was contrary to, or involved the unreasonable application of, clearly established Federal Law, or that it was based on an unreasonable determination of the facts. This subclaim is denied.

### D.     Seventh Claim:  Petitioner's Counsel Rendered Ineffective Assistance When They Failed to Litigate the Legality of His Arrest and the Admissibility of the Fruits of His Unlawful Arrest

Petitioner alleges that police did not have probable cause to arrest him without a warrant and that his counsel were ineffective in failing to seek a hearing to resolve their motion to suppress evidence obtained from his unlawful arrest.  Petitioner insists he was prejudiced by counsel's failure because the evidence allowed police to connect him to Whitcher's death and led them to suspect him in the McDonald murder.

The PCR court, noting that petitioner's trial counsel filed a motion to suppress, denied the subject ineffective assistance claim as follows:

> In its decision in *Thompson*, the Supreme Court recited the facts, including untied shoes without socks on a cold night at 2:00 a.m. after a 1:30 a.m. neighbor's report of loud male voices and a man lying face down on the street with a man kneeling over him and rolling the body over, and rummaging the downed man's pocket, the man ran away and, the police arriving and identifying Mr. Whitcher as dead from fresh stab wounds and a pocket turned out.  The Supreme Court ruled that the Trial Court did not err in allowing evidence of the statement of Petitioner made to police as a part of his being detained on the street:  to the effect that Petitioner denied that he had previously been arrested or had been on probation.  It is also noted that Petitioner had alcohol on his breath, and he denied that he had been in an altercation, despite swelling over his eye.  (Petitioner's Trial Memorandum, pg. 5)  Clearly, the police had probable cause.

If there was a specific ruling on the motion, there is no record of it. As a practical matter, this Court should consider that the motion was denied. Based upon the articulated facts and the record, there is little likelihood that a hearing on the motion to suppress would have resulted in a different outcome than denial of the motion, and thus it would not have any beneficial effect for Petitioner, on the outcome of the trial.

DR 18-8, p. 36, Ex. 395.

Analysis

Probable cause for a warrantless arrest exists if the totality of circumstances of which police have reasonably reliable information would justify a prudent person's belief that the suspect had committed a crime. *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223 (1964). An evaluation of probable cause is based on the totality of the facts available to the officer at the time of the arrest. United *States v. Ortiz-Hernandez*, 427 F.3d 567, 573 (9th Cir. 2005). It is an objective standard so the arresting officer's subjective intention is immaterial in judging whether their actions were reasonable for purposes of the Fourth Amendment. *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007).

Here, when officers encountered petitioner in the early morning hours on the street near the scene of Whitcher's murder, they observed swelling over his eye and an abrasion on his nose; he possessed a martial arts throwing star; he appeared nervous and evasive; he gave police his mother's number as his own; he falsely reported that he had never been arrested and was not on probation; and he was not wearing socks on a cold night. As petitioner points out, there were also facts known to the officers that arguably militated against a finding of probable cause, such as the fact that they saw no blood on petitioner's clothing or on the throwing star despite the abundance of blood at the scene. Moreover, as petitioner suggests, his presence near the crime scene was insufficient, by itself, to establish probable cause; nor was the officers' knowledge of his prior

criminal conviction(s), standing alone, enough to find probable cause. *See United States. v. Di Re*, 332 U.S. 581, 587 & 592, 68 S.Ct. 222, 92 L.Ed.210 (1948); *Beck*, 379 U.S. at 96-97.

But of course, officers did not observe these facts in isolation and did not determine that they had probable cause to arrest petitioner based solely on any one of them. Rather, petitioner's proximity both in time and place to the murder scene, his injuries, his lack of socks on a cold night, his providing officers with the wrong phone number, his demeanor, and his misrepresentations about having a record and being on probation, viewed in total, constituted reasonably reliable information to justify a prudent officer's belief that petitioner had committed a crime.

Similarly, petitioner's reliance on *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) is misplaced. He suggests *Gates* stands for the proposition that a determination of probable cause requires a court assess the relative weight of all facts supporting and discounting a finding of probable cause and argues that because the PCR court did not acknowledge some facts that arguably countered a finding of probable cause, its denial of this ineffective assistance claim is contrary to *Gates*. The Court disagrees. In *Gates*, the Court found that the totality-of-the-circumstances analysis "*permits* a balanced assessment of the relative weights of all of the various indicia of reliability (and unreliability)" of the facts bearing on probable cause. *Id*. at 234 (emphasis added). However, that case does not stand for the proposition that a state court's failure to explicitly acknowledge every fact and every alternative explanation that might discount a finding of probable cause, even in the face of abundant facts supporting probable cause, renders any denial of a claim challenging a finding of probable cause contrary to *Gates* or establishes that the denial was based on an unreasonable determination of facts.

The PCR court found that there was clearly probable cause for the arrest. Such finding is supported by the record. Petitioner fails to demonstrate deficient performance by his counsel in connection with the motion to suppress and any failure to request a hearing, or to show that the results of the proceedings would have been different if counsel had sought a hearing. Accordingly, for the reasons discussed above, petitioner cannot show that the PCR court's denial of both the deficient performance and prejudice prongs of this ineffective assistance claim was contrary to, or involved an unreasonable application of, clearly establish Federal Law, or was based on an unreasonable determination of the facts. This claim is denied.

E. **Eighth Claim: Petitioner's Counsel Rendered Ineffective Assistance When They Failed to Develop and Produce Expert Testimony to Support His Intoxication Defense**

Petitioner alleges that his counsel rendered ineffective assistance when they failed to locate and present an expert to establish an objective level of alcohol in his blood and testify about the impact that level of intoxication would have on his ability to act intentionally. He argues that in failing to utilize an intoxication expert, jurors were left to determine for themselves what the contradictory lay testimony meant without any way to objectively analyze it. Citing *Gernsten v. Senkowski*, 426 F.3d 588, 608-09 (2d Cir. 2005), he insists that where, as here, an intoxication defense was the primary defense, failure to seek a qualified expert and get a report to evaluate the persuasiveness of the expert opinion cannot be justified as strategy where counsel would have discovered qualified and available experts.

In denying this claim, the Oregon Court of Appeals held as follows:

It is well established that a reviewing court will not second-guess a lawyer's tactical decisions unless those decisions reflect an absence or suspension of professional skill and judgement. *Krummacher*, 290 Or. at 875-76, 627 P.2d 458. Among the universe of reasonable tactical decisions is the decision not to present expert

evidence. *Gorham*, 332 Or. at 568, 34 P.3d 161 (concluding that trial counsel's decision not to call an expert witness to present mitigation evidence was a reasonable tactical decision); *Bonin v. Calderon*, 59 F.3d 815, 834 (9th Cir. 1995)("[W]hile the Constitution requires that a criminal defendant receive effective assistance of counsel, the presentation of expert testimony is not necessarily an essential ingredient of a reasonably competent defense."). Nonetheless, tactical decisions must be grounded on a reasonable investigation. *Id*. at 835; *Stevens v. State of Oregon*, 322 Or. at 108, 902 P.2d 1137 (1995). The question in each case is whether trial counsel's investigation was legally and factually appropriate to the case. *Stevens*, 322 Or. at 108, 902 P.2d 1137.

Here, there is evidence in the record that trial counsel contacted an intoxication expert and considered the tactical advantages and disadvantages of calling an expert witness to testify about petitioner's level of intoxication and "decided not to present the expert testimony because the state would then be allowed to provide [its] own expert to refute our claims." Although petitioner contends that that decision was not reasonable because that reasoning could apply to any defense, the relevant concern animating trial counsel's decision was not simply that calling an expert witness would allow the state to present expert testimony in rebuttal. Instead it was that, in light of the facts of petitioner's case, "the jury would find the testimony of a state expert on why petitioner had the full intent to commit the murders more credible" than a defense expert. In light of those concerns, and the other evidence presented on petitioner's level of intoxication, trial counsel's decision not to present expert testimony about petitioner's level of intoxication was a reasonable tactical decision. *See, e.g., id* at 109, 902 P.2d 1137 ("A 'tactical decision' in the course of an investigation is a conscious choice by a lawyer either to take or to omit some action on the basis of an evaluation of the nature and complexity of the case, the likely costs and potential benefits of the contemplated action, and other factors.").

*Thompson v. Belleque*, 268 Or. App. 1, 17-18 (2014).

This claim turns largely on the reasonableness of the Oregon Court of Appeals' factual finding that there was "evidence in the record that trial counsel contacted an intoxication expert and considered the tactical advantages and disadvantages of calling an expert witness to testify about petitioner's level of intoxication."[12] While petitioner acknowledges that Mr. Martz stated

---

[12] The Court rejects petitioner's assertion that the Oregon Court of Appeals determined that counsel made a reasonable tactical decision to not even explore expert testimony. It made no such finding.

that he might have contacted an expert, a Mr. Larson, about an intoxication defense, he insists that there is no indication anything substantive was learned from that expert. In addition, petitioner insists counsel failed to interview an expert about petitioner's level of intoxication and the impact it would have on his ability to act with intent to commit aggravated murder, including information that would not have been within the knowledge of a lay jury. According to petitioner, counsel's concern that the state's expert would be more credible on the issue of intent and their doubts about an intoxication defense in general, did not justify foregoing an intoxication expert—especially when it was their primary defense. He argues that counsel's decision to forego an intoxication expert without first locating an expert and getting a report, cannot be deemed a reasonable strategic decision.

Respondent maintains that petitioner cannot meet his heavy burden of rebutting, by clear and convincing evidence, the presumption of correctness due the Oregon of Court of Appeals' factual findings. Moreover, he notes that the court addressed petitioner's counsel's concern about a rebuttal state expert -- finding that it went beyond concern that the jury would inherently find the state's expert more credible, to acknowledge that a potential battle of experts would occur in the context of what the PCR court characterized as a "mountain of facts against [petitioner]" showing his ability to carry on and make decisions over an extended period of time on the night in question. This evidence included facts that: petitioner voluntarily consumed alcohol to the point that he was refused sale of alcohol by a store operator who knew him; he chose to continue drinking; he walked to the Driftwood Tavern with Whitcher and ordered and consumed more alcohol; after being loud, obnoxious and otherwise inappropriate, the bartender asked him to leave; as he and Whitcher left, one of them said "I feel like killing somebody tonight"; before petitioner reentered the tavern, he

said something to the effect of "I'm going back in there and kick that guy's ass," and told Whitcher: "If we do this, you know, we're going to jail"; within 5-10 minutes, he ran into the tavern, grabbed McDonald from behind, stabbed him, and dragged him outside, stabbed him 14 times and caused his death; he threw Oyamada to the ground and stabbed her twice after she tried to pry him off McDonald; he stabbed Jones 6 times when he grabbed petitioner; he ran away with Whitcher about 1000 yards to petitioner's grandmother's house where he lived and unlocked the door with a key; he found and consumed more alcohol, broke a glass and tried to clean it up; he talked to his grandmother who, thinking Whitcher was drunk, asked him to leave; petitioner told her he was going to see Whitcher home and left with him; on the street a short distance away, petitioner stabbed Whitcher 20 times and caused his death; after killing him he rolled the body and took Whitcher's wallet; petitioner walked back to his grandmother's, hid the knife and wallet, took off his bloody clothes and put them in the washing machine to wash; he returned to the area of Whitcher's murder where police stopped and questioned him; he denied involvement in the murder, lied about his address, lied about prior arrests and not being on supervision; and after his arrest, he destroyed a speck of blood on his finger as police attempted to retrieve it for evidence. DR 18-8, pp. 40-42, Ex. 395.

## Analysis

It is well settled that there are no specific guidelines, technique, or approach that a trial attorney must satisfy in order to render constitutionally sufficient assistance. *Harrington*, 131 S.Ct. at 788; *Pinholster*, 131 S.Ct. at 1403. A decision motivated by reasonable strategic concerns and based upon a thorough investigation of the relevant law and facts deserves a heavy measure of deference. *Strickland*, 466 U.S. at 690-91; *see also Pinholster*, 131 S.Ct. at 1403 (counsel

should be presumed to have made all significant decisions in the exercise of reasonable professional judgment).

However, "counsel cannot be said to have made a tactical decision without first procuring the information necessary to make such a decision." *Reynoso v. Giurbino*, 462 F.3d 1099, 1112 (9th Cir. 2006). Indeed, "'[c]riminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence.'" *Hinton v. Alabama*, 571 U.S. 263, 273, 134 S.Ct. 1081, 1088, 188 L.Ed.2d 1 (2014)(quoting *Harrington*, 131 S.Ct at 778). The court must conduct an objective review of counsel's performance, measured for reasonableness under prevailing professional norms, including a "context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" *Wiggins v. Smith*, 539 U.S. 510, 523, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003)(citing *Strickland*, 466 U.S. at 688-89). The Ninth Circuit has cautioned that, "[t]he Supreme Court has repeatedly made plain that counsel has the duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Weeden v. Johnson*, 854 F.3d 1063, 1069 (9th Cir. 2017).(internal quotation and citations omitted).

Here, the record showing what contact, if any, petitioner's counsel had with an intoxication expert is sparse. Nevertheless, the Oregon Court of Appeals determined that defense counsel's decision not to call an intoxication expert was a tactical one "grounded on a reasonable investigation." It based this finding on Mr. Martz's PCR affidavit wherein he averred that "[w]hile we may have contacted a Mr. Larsen regarding the intoxication defense, we decided not to present the expert testimony because the state would then be allowed to provide their own expert to refute out claims." DR 18-32 at 201. While the extent of any input this expert may have provided Mr.

Martz is unknown, the Oregon Court of Appeals was satisfied that in the context of the facts counsel were aware of, it was sufficient for counsel to make a reasonably informed tactical decision not to utilize an intoxication expert in this case. As noted above, the court determined that counsel were concerned with more than just a battle of experts where the jury would prefer the state's expert. Rather, given the aforementioned "mountain" of evidence bearing on petitioner's ability to function and make decisions over an extended period, counsel were concerned that use of intoxication experts could work against petitioner. In so finding, the Oregon Court of Appeals suggests that counsel were reasonably concerned that the quantity of unfavorable evidence arguably establishing petitioner's intent, posed a huge challenge for a defense expert to overcome and an opportunity for a state expert to exploit those facts—perhaps at the expense of counsel's ability to capitalize on other, relatively favorable testimony of witnesses to petitioner's obvious intoxication, as well as, the jury's lay experience with intoxication.

However thin the support for the Oregon Court of Appeals' finding that there was evidence in the record that trial counsel contacted an intoxication expert, petitioner has not, as he must, rebutted this finding by clear and convincing evidence. He argues that there was no evidence that his counsel ever received any kind of report or input from an expert. While a fair assertion with regard to receipt of a report, petitioner has not shown that counsel did not consult with Mr. Larson and did not receive any "input" from him -- as Mr. Martz recalled he might have done. It is petitioner's burden to rebut a challenged factual finding by clear and convincing evidence and he has failed to do so here. Accordingly, the Court must defer to the Oregon Court of Appeals' finding.

Based on the foregoing, the Court concludes that the record supports the Oregon Court of Appeals' finding that there was evidence in the record that counsel contacted an intoxication expert and considered the tactical advantages and disadvantages of calling such an expert. Given the presumption of reasonable professional judgment the Court is to afford counsel, petitioner cannot demonstrate that the court's determination that counsel's representation was effective here was contrary to, or involved the unreasonable application of, clearly established Federal Law or that it was based on an unreasonable determination of the facts.

At a minimum, the Court concludes that as it applies to this subclaim, petitioner cannot demonstrate that the Oregon Court of Appeals' determination that he failed to prove that "any deficiency [in his counsel's performance] had a tendency to affect the outcome of the proceeding," was contrary to, or involved an unreasonable application of, clearly established Federal Law, or was based on an unreasonable determination of the facts.

He is not entitled to relief on this ineffective assistance claim.

## F. Ninth Claim: Petitioner's Counsel Rendered Ineffective Assistance When They Advised Him Not to Testify

According to petitioner, his counsel rendered ineffective assistance when they advised him not to testify because the jury never heard his explanation of how intoxicated he was; and that he never intended to kill anyone but that "things got out of hand," largely due to his inability to judge his interactions with people due to his intoxication. He insists that when counsel advised him not to testify, they told him they intended to call an intoxication expert. He maintains that had he known counsel was not going to call an expert witness to establish his level of intoxication and its impact on him, he would have exercised his right to testify.

In denying this claim, the PCR court found:

Petitioner claims that had he known of the weakness of his intoxication defense, he would have insisted upon testifying, so that he could present evidence on how drunk he was. Petitioner would have this Court believe that he wanted to take the stand to present evidence as to amount of alcohol he consumed during the relevant period. This Court does not believe Petitioner. There is great risk in such a strategy, including opening up Petitioner's prior criminal record as impeachment. Further, Mr. Martz has credibly testified:

> Petitioner is correct that we advised him not to testify. In our minds, the prosecution would have obliterated all of petitioner's defense on cross-examination. Furthermore, Ms. Dickison and I were concerned with what petitioner might say during his testimony. We thought that if he testified, petitioner might say something that would have ruined any chance of avoiding the death penalty. Finally, in our estimation, petitioner's testimony would not have added much to his intoxication defense. We already had testimony that he had consumed a substantial amount of alcohol, including the testimony of a convenience store clerk (who was likely very credible, given that he appeared to have no bias in the case) that he had refused to sell petitioner alcohol several minutes before the McDonald murder because petitioner was so drunk. As I recall, petitioner did not tell us that he wished to testify on his own behalf. (Ex. 116, Martz Affidavit, page 5, par. 11).

As has been discussed, there was a mountain of opposing evidence on Petitioner's behavior relating to his ability to form an intent. Petitioner should have been aware of this at Trial. Even if it was, in essence, the only defense, there could be no reasonable expectation of success of that defense, at best only a hope. As Trial Counsel testified:

> "Sometime after the [mental defense] evaluation, against our advice, Petitioner filed several motions to withdraw guilty-except-for insanity defense. As I recall, Ms. Dickison and I made it known to the Court that we thought it was a bad idea, as **Petitioner did not have any other realistically viable defenses**. (Emphasis added, Ex 116, page 3).

> "The intoxication defense did not seem as strong, because in my experience, jurors are hesitant to find someone not guilty due to intoxication. (Id at page 3).

Petitioner's testimony on the exact number of drinks he consumed, or testimony of how that may have subjectively affected his ability to form intent, would reasonably have added all but nothing to any effect on the jury's determination. In deciding an

ability to form intent, it is unlikely that a drunk person would be considered a good reporter as to how drunk they were. This would particularly be true for a person who the jury had evidence that he may have said: "I feel like killing somebody tonight." This claim fails.

DR 18-8, pp. 44-45, Ex. 395.

<u>Analysis</u>

Criminal defendants have a constitutional right to testify at trial in their defense and relinquishment of this right must be knowing and intentional. *Rock v. Arkansas*, 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987); *United States v. Joelson*, 7 F.3d 174, 177 (9th Cir. 1993). "The *Strickland* standard is applicable when a petitioner claims his attorney was ineffective by denying him his constitutional right to testify." *Matylinsky v. Budge*, 577 F.3d 1083, 1097 (9th Cir. 2009)(citing *Medley v. Runnels*, 506 F.3d 857, 861 (9th Cir. 2007)).

Petitioner contends that the PCR court based its denial of this claim on an unreasonable factual finding discrediting petitioner's assertion that had he known of the weakness of his intoxication defense he would have insisted on testifying. He insists that given the history between him and his counsel, and in the face of an ineffective defense with no intoxication expert, his wanting to testify was reasonable. For his part, respondent insists that the PCR court's credibility determination was supported by facts that: (1) petitioner risked opening up his prior criminal record; (2) there was substantial objective evidence bearing on petitioner's behavior related to his ability to form the requisite intent; (3) counsel were concerned with what petitioner might say on the stand that could hurt his chances of avoiding the death penalty; and (4) petitioner's testimony would have added little to the case. In making these findings, the PCR court necessarily concluded that petitioner suffered no prejudice arising out of counsel advising him not to testify.

Based on the foregoing and on the Court's independent review of the record, petitioner cannot establish either deficient performance or resulting prejudice stemming from his counsel advising him not to testify. At a minimum, as the PCR court reasonably concluded, petitioner's testimony regarding how much alcohol he consumed and its impact on him that night would have been, at best, ineffectual. Accordingly, the Court concludes that petitioner cannot show that the PCR court's denial of this claim was contrary to, or involved an unreasonable application of, clearly established Federal Law, or that it was based on an unreasonable determination of the facts. He is not entitled to relief on this claim.

G.   **Tenth Claim:  Petitioner's Counsel Rendered Ineffective Assistance When They Failed to Effectively Argue for Judgment of Acquittal on Aggravated Murder Counts 18 and 19 on the Basis the Murders were not Committed in the "Same Criminal Episode"**

According to petitioner, there was substantial authority under Oregon law to support his motion for judgment of acquittal (MJOA) on Counts 18 and 19, but counsel failed to reference and analyze relevant facts and law surrounding the concept of "same criminal episode," and thereby failed to give the judge a basis for ruling in petitioner's favor. He further asserts that counsel failed to ground his arguments in federal due process and insists that counsel's failures prejudiced him because he was convicted on both counts, each carrying a potential for a death sentence. Petitioner also faults appellate counsel with failing to raise this claim at all.

For his part, respondent notes that the Oregon Court of Appeals denied these claims on the grounds that petitioner failed to prove either deficient performance or prejudice and argues that the Court should deny relief on these claims because petitioner makes no attempt to show how the Oregon Court of Appeals' decision involved an unreasonable application of clearly established federal law.

In reviewing a sufficiency of the evidence claim, the Court determines if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In addition, AEDPA adds another layer of deference over the already deferential *Jackson* standard. Under AEDPA, the federal court may not grant a habeas petition unless it finds that the state court unreasonably applied the principles underlying the *Jackson* standard when reviewing petitioner's claim. *See e.g., Jaun H. v. Allen III*, 408 F.3d 1262, 1275 n.12 (9th Cir. 2005); *Jones v. Wood*, 114 F.3d 1002, 1013 (9th Cir. 1997)(recognizing that the "unreasonable application" standard applies to insufficient evidence claim).

In his Third Amended Petition for Post Conviction Relief, petitioner alleged:

### 34.

Trial counsel failed to move for judgments of acquittal on Counts 18 and 19 on the basis that the evidence in the record was legally and factually insufficient to establish that petitioner had murdered two persons in the same criminal episode and that conviction on those counts therefore, violates petitioner's right to due process under the Sixth and Fourteenth Amendments to the United States Constitution. Because counsel did not move for acquittal on the above basis, petitioner received death sentences on those counts. Had counsel so moved for judgments of acquittal, the trial court would have been require[d] to grant same.

DR 18-6, p. 225, Ex. 375.

Similarly, with regard to appellate counsel, he alleged:

### 65.

Appellate counsel failed to raise as an issue on appeal, an argument that the evidence in the record was legally and factually insufficient to establish that petitioner had murdered two persons in the same criminal episode and that conviction on those counts constitutes a violation of petitioner's rights to due

process under the Sixth and Fourteenth Amendments to the United States Constitution.

*Id*. at 241.

Citing the statutory definition of "one criminal episode,"[13] the PCR court explored whether it would have made any difference if petitioner's trial counsel had grounded his arguments in federal due process. In finding that it would not and denying the claim, it held that, "[t]he events involving Petitioner assaulting and stabbing three people and killing one of them at about 10:30 p.m., involves the same criminal episode as the events thereafter: Petitioner running away, continuing drinking and killing his 'accomplice' (the only person who knew Petitioner, who witnessed the first killing) at about 1:30 a.m." DR 18-8, p. 46, Ex. 395.

In affirming this denial, the Oregon Court of Appeals noted that "[w]hether the trial court understood trial counsel's arguments to stem from federal due process or Oregon law, the inquiry was the same: Did the state introduce enough evidence to allow a rational juror to find that the two murders were committed during the same criminal episode." *Thompson*, 268 Or. App. at 20.

Here, petitioner suggests that the Oregon courts "misconstrued" the claim as one alleging only that counsel was ineffective for failing to federalize his arguments in support of the MJOA, when in fact, the "gravamen" of the claim was that counsel was ineffective for failing to *effectively argue* the motions, including failing to cite supporting federal and state authority. These arguments notwithstanding, trial counsel moved for judgment of acquittal on Counts 18 and 19 on the basis that the State had failed to show that the homicides occurred in the same criminal episode

---

[13] "One criminal episode means continuous and uninterrupted conduct that establishes at least one offense and is so joined in time, place and circumstances that such conduct is directed to the accomplishment of a single criminal objective. ORS 131.505(4)." DR 18-8, p. 46, Ex. 395.

and a fair reading of the applicable PCR claim reveals that petitioner faulted counsel with failing to ground his arguments in federal due process.[14]

Regardless, the record establishes that the parties and the trial court were aware of the key facts that the murders took place approximately three hours and eleven blocks apart, and that in between the two murders petitioner and Whitcher went to petitioner's grandmother's house and continued to drink until she asked Whitcher to leave. In addition, they discussed the applicable legal standard governing the concept of "same criminal episode" under Oregon law in the context of jury instructions. While the court had not yet settled on which instruction to employ, it is apparent that it viewed the matter as a factual question for the jury to resolve. Accordingly, however "half-hearted" petitioner's counsel's arguments in support of the MJOA were, he cannot show that the trial court would have granted his motion if he had been more specific in his arguments to the court, or if he had grounded them in federal due process.

Petitioner argues that the homicides were not so closely joined in time, place or circumstances as to constitute "continuous and uninterrupted conduct" and were not "cross related" because the complete account of the McDonald homicide can be told without reference to details of the Whitcher homicide, which had not yet occurred. *See State v. Fitzgerald*, 267 Or. 266, 273 (1973)(charges arise out of the same act or transaction if they are so closely linked in time, place and circumstances that a complete account of one charge cannot be related without relating details of the other charge); *State v. Boyd*, 271 Or. 558, 566-67 (1975)(charges have to be cross related,

---

[14] This interpretation is bolstered by the fact that during his PCR proceedings in his Objections to Proposed Factual Findings and Conclusions of Law, petitioner objected to the finding and conclusion that "counsel's failure to federalize their motions for judgment of acquittal on Counts 18 and 19 were harmless," but did not indicate that the heart of the claim involved an allegation that counsel were ineffective in failing to effectively argue the claim. DR 18-8, p. 85.

meaning the facts of each charge can be explained adequately only by drawing upon facts of the other charge).[15]  Critically however, whatever the merits of these arguments, nothing in the cited authority, either under Oregon law or federal due process, suggests that had counsel argued the motions more robustly the trial court would have been required to grant them as a matter of law because no reasonable juror could conclude that these homicides occurred in the same criminal episode.  As the PCR court noted, there was a plausible argument that Whitcher's role as an "accomplice" or "witness" sufficiently linked the two homicides such that a reasonable juror could conclude they occurred in the same criminal episode.

Similarly, petitioner's claim that appellate counsel was ineffective for failing to raise a claim on appeal is without merit because he had failed to show that it was objectively unreasonable for counsel not to raise the claim or that there is a reasonable probability that if counsel had raised the claim, the appeal would have succeeded.  *Miller v. Keeney*, 882 F.2d 1428, 1433-34, n.9 & n.10 (9th Cir. 1989).   In the last reasoned decision on this claim, the PCR court held:

> [Petitioner] has failed to demonstrate that the facts surrounding his murders of McDonald and Whitcher (as summarized by the Oregon Supreme Court in its opinion on direct review) could not give rise to a finding that the murders were part of the same criminal episode, see ORS 131.505(4)(defining "criminal episode" to mean "continuous and uninterrupted conduct that establishes at lease one offense and is so joined in time, place and circumstances that such conduct is directed to the accomplishment of a single criminal objective"), such that appellate counsel could not have reasonably declined to raise that issue.  Further, for essentially the same reason, petitioner has failed to establish that had counsel raised the issue, it is more probable than not that the result of petitioner's appeal would have been different.

---

[15] These are essentially the same arguments that petitioner's counsel made to the jury in closing arguments.  Counsel submitted that:  the McDonald and Whitcher cases were distinct; the events occurred at the tavern, there was a time lapse, and then the events occurred on the street; you could tell one story without having to tell the other; while the Oyamada, Jones and McDonald stabbings were the same criminal episode, the death of Whitcher hours later was not.  DR 18-27, p. 75, Ex. 487.

DR 18-9, pp. 17-18, Ex. 402.

The record does not establish that had appellate counsel assigned the denial of this motion as error, it is more probable than not that the result of the appeal would have been a reversal of the trial court's ruling. Instead, the record contains evidence from which the trial court could have found that it was a question for the jury as to whether the homicides occurred in the same criminal episode. Accordingly, the Court concludes that petitioner has not demonstrated that the Oregon court's denial of relief on these trial and appellate counsel claims is contrary to, or involves an unreasonable application of, clearly established Federal Law. These claims are denied on the merits.

**H.** **Eleventh Claim: Petitioner's Counsel Rendered Ineffective Assistance When They Failed to Argue Federal Authority in Objecting to Re-instructing the Jury During their Deliberation on the Definition of "Entering and Remaining" in a Building, a Crucial Element in the Prosecution's Case**

According to petitioner, his trial counsel acted ineffectively when they failed to argue that a re-instruction on "entering and remaining unlawfully" given in isolation, during jury deliberations, and directly addressing a jury question, violated his federal due process rights. Specifically, he contends that in accordance with *Bruton v. United States*, 391 U.S. 123, 135-36, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), it was unrealistic to expect the jury in these circumstances not to place undue emphasis on the new instruction. Accordingly, he maintains that the PCR court's conclusion that "[t]here is no reasonable likelihood that additional grounds for the objection to the instruction would have resulted in a different result" was an unreasonable application of clearly established Federal Law.

By way of background, four counts in the indictment were premised on the state's theory that the bartender had excluded petitioner from the Driftwood Tavern before petitioner reentered and attacked McDonald. Those counts required the jury to find that petitioner "entered or remained unlawfully" in the tavern. After retiring to deliberate, the jury sent a note to the trial court asking: "What constitutes being asked to leave a bar and what authority does the bartender have? What does he have to 'do or say--legally' to kick someone out."

The court was initially prepared to respond to the jury's question by advising them that they had all the evidence and legal instructions in the case. However, the state pointed out that the court had not given all their requested jury instructions, including instructions defining "enter and remain unlawfully" and "person in charge." The court acknowledged its oversight, noting that the state would have been entitled to these instructions and that "clearly in the light of this case, that is a critical issue that the jury needs to have legal direction on." DR 18-26, p. 198, Ex. 487. Nevertheless, petitioner's trial counsel objected to any further instruction on the grounds that the timing of the instructions would cause the jury to place undue weight on them. Petitioner also notes here that the state had ample opportunity to alert the court regarding the missed instructions and failed to do so.[16] Over petitioner's objection, the court gave the uniform instructions, cautioning the jury to consider the instructions as a whole and not to take the new instructions out of context or give them undue emphasis.

Analysis

---

[16] As the Oregon Supreme Court noted on direct review, "the state requested Uniform Criminal Jury Instructions that define the phrases "enter or remain unlawfully" as used in ORS 164.205(3) and "person in charge" as used in ORS 164.205(5). However, the trial court inadvertently neglected to instruct the jury on those definitions," and neither party alerted the court to this omission. *State v. Thompson*, 328 Or. at 265.

A jury is generally presumed to understand and follow instructions. *Weeks v. Angelone*, 528 U.S. 225, 234, 120 S.Ct. 727, 145 L.Ed.2d 727 (2000). However, the Supreme Court in *Bruton* recognized that an exception to the presumption is warranted if "the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of the failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." 391 U.S. at 135. In *Bruton*, the Court held that the use of a confession by a co-defendant for which cross-examination was foreclosed violated the defendant's Sixth Amendment right under the Confrontation Clause. *Id.* The Court observed that limiting instructions to the jury could not overcome the prejudice resulting from the introductions of such confessions. *Id.* at 135-36.

Significantly, however, exceptions like the one addressed in *Bruton* are "narrow," and the presumption continues to apply in "many varying contexts." *See Richardson v. Marsh*, 481 U.S. 200, 207-08, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987). Moreover, under AEDPA, clearly established Federal Law must be construed narrowly so that it must "squarely address" the issue presented. *See Moses v. Payne*, 555 F.3d 742, 754 (9th Cir. 2009). *Bruton* involved the possibility of juror exposure to evidence that was inadmissible against the defendant. In contrast, at issue here are the inadvertently omitted uniform jury instructions—the correctness of which petitioner does not challenge--and the jury's ability to follow the court's instruction to view all of the instructions as a whole and not to give undue weight to a re-instruction. Accordingly, in the absence of federal precedent squarely addressing the issue in this case, the PCR court's rejection of this claim could not have been contrary to, or involve an unreasonable application of, clearly established Federal Law.

In addition, the narrow concern raised in *Bruton*, namely uncertainty as to whether a jury could follow an instruction to disregard a confession that was inadmissible against the defendant because it violated the Confrontation Clause, was not raised here. Such uncertainty becomes unacceptable only if there is an "overwhelming probability" that the jury was unable to follow the court's instructions to disregard evidence that was powerfully incriminating. *See Richardson*, 481 U.S. at 208. It does not rise to the level of constitutional error in a case like this, where the trial court found both that the state was entitled to the instructions; and perhaps more importantly, that the jury needed them to fulfill its role.

Accordingly, the PCR courts denial of this ineffective assistance claim and its determination that that the result would not have been different if petitioner's trial counsel had invoked federal authority in their objections to the re-instruction, were not contrary to, nor did they involve an unreasonable application of, clearly established Federal Law.

For these reasons, habeas relief is not warranted on this claim.

I.   **Twelth Claim:   The PCR Court Erred When it Denied Petitioner's "Cummulative Error" Claim of Ineffective Assistance of Trial and Appellate Counsel**

Petitioner contends that he is entitled to relief due to the cumulative impact trial and appellate counsel's errors and omissions had on the guilt phase of his trial. In denying this claim, the PCR court held:

> None of the claims of inadequate assistance of counsel set forth in Claims 1 through 11 [guilt-phase ineffective assistance claims] of the Petition has merit. Further, petitioner fails to show that any errors of counsel may have committed – taken together – had the cumulative effect of causing prejudice, as that term is defined for purposes of inadequate assistance of counsel under the state and federal constitutions.

DR 18-9, p. 3, Ex. 402.

51 – OPINION AND ORDER

Assuming that it is clearly established federal law that cumulative errors by counsel can amount to prejudicially ineffective assistance, see, e.g., *Harris v. Wood*, 64 F.3d 1432, 1438 (9th Cir. 1995)(finding that counsel's cumulative deficiencies, including failure to investigate, consult, challenge evidence, conduct proper voir dire, propose or except jury instructions, raise or preserve meritorious issues, and call the defendant to testify, raised reasonable probability that outcome of trial might well have been different), petitioner has not shown that the alleged errors prejudiced him. Unlike counsel in *Harris*, whose performance was found to have been "deficient in eleven ways, eight of them undisputed," 64 F.3d at 1439, petitioner's claims of ineffective assistance of trial and appellate counsel are without merit. Accordingly, he cannot demonstrate that the PCR court's rejection of his cumulative error claim was contrary to, or involved the unreasonable application of, clearly established Federal Law. This claim does not warrant federal habeas relief.

**J.     Thirteenth Claim:  Petitioner's Counsel Rendered Ineffective Assistance of Counsel During the Penalty Phase of His Trial**

Petitioner alleges his counsel were ineffective during the penalty phase of his trial in failing to adequately investigate and present a case for life through available mitigation evidence, acting as agents of the prosecution, failing to adequately prepare petitioner for his for allocution, failing to seek a provocation instruction pertaining the McDonald murder, and failing to present the jury with available evidence countering the prosecution's future dangerousness arguments.

The Court addresses the following specific claims:

1.  Petitioner's counsel rendered ineffective assistance in their investigation and preparation for the penalty phase when they failed to secure and present readily available evidence of:  (1) petitioner's mother's lengthy stay in a mental hospital as a teenager, her diagnosis of schizophrenia, and her having been subjected to nineteen electroshock therapy treatments; and (2) petitioner's father's diagnosis of schizoaffective disorder and PTSD related to trauma he experienced in Vietnam shortly before petitioner's birth. (Pet. [43], pp. 157-163 & 172).

The Oregon courts addressed and rejected claims that counsel violated standards for attorney preparation and failed to adequately investigate and present mitigating evidence during petitioner's penalty-phase proceedings. *See Thompson*, 268 Or. App. at 21-34. In his Third Amended Petition for Post Conviction Relief petitioner alleged that he was denied effective assistance of counsel during his penalty phase when counsel failed to prepare and obtain the services of a mitigation specialist to assist in "locating, compiling and presenting available evidence of mitigation on his behalf" and that as a result various evidence was not identified and presented at his trial, including evidence of:

***

(b) Multi-generational biological family dysfunction, **mental disease and defect** and substance dependance which adversely impacted petitioner's development, maturation, and mental well-being.

DR 18-6, pp. 235-36, Ex. 375 (emphasis added). Moreover, while petitioner's PCR counsel did not present medical records confirming petitioner's parents' specific diagnosis, in Dr. Cooley's affidavit prepared for the PCR proceedings, he noted that petitioner's mother "had an eating disorder, depression, and has been diagnosed with schizophrenia," and that his father reported that "[h]e had been diagnosed with posttraumatic stress and with schizophrenia." DR. 18-21, p. 52, Ex. 475. In addition, petitioner's counsel began his opening at the PCR trial highlighting the fact that "Dwight and Janet Thompson were both – had been diagnosed previously with mental illness themselves." DR 18-35, p. 31, Ex. 512.

Notably too, on appeal from the PCR court's denial of relief, petitioner alleged that trial counsel failed to present significant evidence of his family's mental illness and dysfunction, including evidence that:

> Petitioner's parents met in therapy; **both were diagnosed schizophrenics**, as was a paternal uncle; his mother suffered from an eating disorder and depression, and his father was being treated for Post-Traumatic Stress Disorder (Ex 10, pp. 165-67; Ex. 41, p. 13; Ex 117, p. 71; 9/14/07 Tr 35).

DR 18-41, pp. 201-02, Ex. 579 (emphasis added). Citing *Porter v. McCollum*, 558 U.S. 30, 40-41 (2009); *Hamilton v. Ayers*, 583 F.3d 1000, 1127-28 (9th Cir. 2009); and *Daniels v. Woodford*, 428 F.3d 1181, 1204 (9th Cir. 2005), petitioner argued there, as he does here, that his counsel's failure to present this and other mitigation evidence amounted to deficient performance.

In analyzing petitioner's claim that trial counsel were ineffective for failing to present a significant amount of mitigation evidence during the penalty phase, the Oregon Court of Appeals noted:

> As identified by petitioner, that mitigation evidence can generally be divided into two categories: First, testimony from petitioner's family regarding their love for petitioner, his character and background, and the effect that his execution would have on them. Second, evidence relating to petitioner's dysfunctional upbringing and other challenges, as well as **his multi-generational family history of mental illness** and substance abuse, which would provide historical background and context for the development of petitioner's diagnosed personality disorder.
>
> In support of that claim, petitioner presented affidavits of a death-penalty mitigation specialist, as well as various mental-health experts, which generally explained and amplified the mitigation evidence in counsel's possession at the time of the penalty-phase trial.

*Thompson*, 268 Or. App. at 25 (emphasis added).[17]

---

[17] That court also noted that the Oregon Supreme Court has recognized that the standards for determining the adequacy of counsel under the state constitution are functionally equivalent to the standards governing the effectiveness of counsel under the federal Constitution. *Id*. at 6.

In the underlying trial proceeding, the PCR court determined that it was a reasonable strategy for trial counsel to focus on the issue of petitioner's future dangerousness in the penalty phase and to forgo emphasizing evidence of his troubled youth, emotional problems, alcohol abuse, dealings with his dysfunctional family, poor educational experience, and fleeting good behavior at the Children's Farm, because this evidence, which served to explain why petitioner was the way he was, would have limited value on the future dangerousness question. It found that this evidence, while mitigating, would have little impact in the face of substantial evidence establishing petitioner's lengthy and continuing history of extremely violent conduct in and out of custody.

Ultimately, the Oregon Court of Appeals determined that the PCR court did not err in concluding that petitioner's counsel's penalty-phase strategy of showing that despite his violent past, there was potential treatment for petitioner in prison was reasonable.[18] Critically too, on the question of whether petitioner's trial counsel made a tactical decision as to what mitigation evidence and witnesses to present, the Oregon Court of Appeals found, "there [was] evidence that trial counsel had dedicated significant resources to investigating and gathering potential mitigation evidence and had made a conscious decision to identify and call the witnesses that they did – and not to call those witnesses whom they chose not to call." *Id*. at 28. It found that because the broad themes represented by the evidence petitioner faulted counsel with failing to investigate and present to the jury were presented through Dr. Janzer[19], the PCR court did not error in concluding

---

[18] The PCR court found that "his counsel's approach was obvious and straightforward: to convince the jury that although petitioner had a serious personality disorder, which was responsible for his history of violent conduct, his disorder could be treated in prison and successful treatment would eliminate his violent conduct." DR 18-9, 7, Ex. 402.
[19] The court summarized Dr. Janzer's testimony as follows:

Regarding petitioner's troubled family, Janzer testified that petitioner's records indicated substantial family problems, "so that all of the people who tried to help [p]etitioner as he was growing up bumped up against family problems," and that those issues are "still a big problem with [him]," because he has not "come to terms with his family yet." Janzer testified that petitioner's mother had abused him as a child, and that the abuse ended when petitioner, at around age 13, punched his mother in the stomach and knocked her to the ground.

As a result of those problems, Janzer testified that petitioner had "spent a lot of time with his grandmother, and then a series of foster homes, none of which worked out very well, and various programs," but that petitioner "was a very difficult *** boy to help." Janzer testified that, in the records that he had reviewed, petitioner was "turned down [by] probably seven programs in this area [that] decided they couldn't help him." Additionally, Janzer testified that he had seen multiple records of petitioner being hospitalized with "suicidal thinking."

Janzer also testified that petitioner had had difficulty in school, and that he was using drugs and alcohol to "dull his appreciation of reality and pull down his level of anxiety." He testified that petitioner "started drinking a little bit and a little bit more and a little bit more and finally he [was] drinking by the fifth *** of vodka." Although, in Janzer's opinion petitioner was "kind of young for an alcoholic," he acknowledged that "it does happen."

Janzer explained the importance of background:

"The reason I got lost in the background because that's important. You never meet a borderline personality disorder who doesn't come from some mixed-up family setting. Then as he get older and is supposed to be more independent the problems show up. And one of the ways trying to understand why he reacts the way he does is there's a frantic fear of being abandoned or rejected. That seems to be the basic problem with borderline is that people are going to kick him out or ignore him, things of that order. The relationships are unstable, and he goes between you're either a good guy or a bad guy. You're either idealized or you're the worst. There's nothing in between for him. And that fits in with a lot of his own remarks."

Janzer went on to explain how petitioner's personality disorder leads him to act impulsively, to overreact to rejection – perceived or real –and engage in "inappropriate displays of anger" that are "disproportionate." To an outside observer of those displays of anger, Janzer testified that "[t]here [is] no explaining why [petitioner] would go to the lengths he did in terms of what seemed to be happening."

that petitioner's counsel exercised reasonable professional skill and judgment in preparing and presenting evidence in petitioner's penalty-phase trial.

Here, petitioner references records and documents obtained during the pendency of this federal habeas action including: (1) records of his mother's hospitalization and portions of his father's VA file documenting their respective diagnosis of schizophrenia; and schizoaffective disorder and PTSD; (2) records of treatment he received at CDRC when he was a child; (3) records of his July 1991 admission at OHSU; and (4) analysis by Drs. Close and Goldmann discussing the impact of this evidence. Pet's (Sealed) Exs. 2, 3, 6, 13, 15 & 17. *Pinholster* notwithstanding, he argues that the Court may rely on these new records because they "fundamentally alter" the claim that the Oregon Court of Appeals resolved on the merits below, thereby making it a new, unexhausted claim. He further asserts that *Martinez* excuses the procedural default of this new claim and that the Court should review it *de novo*.

<u>Analysis</u>

Factual allegations not presented to a state court may render a claim unexhausted if the allegations "fundamentally alter" the legal claim presented and considered by the state courts. *Dickens v. Ryan*, 740 F.3d 1302, 1318 (9th Cir. 2014)(citing *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986)). New evidence fundamentally alters a claim if it places the claim in a significantly different and stronger evidentiary posture than it had in state court. *Id*. (citing *Aiken v. Spalding*, 841 F.2d 881, 884 n.3 (9th Cir. 1988)). At issue in *Dickens* was the petitioner's assertions that his counsel rendered ineffective assistance during his sentencing proceeding when he failed to obtain

_____

*Id*. at 32-33.

and introduce evidence that Dickens suffered from organic brain damage and FAS. These assertions, made for the first time in federal habeas, including extensive factual allegations. In contrast, in the Arizona courts below, Dickens claimed that his sentencing counsel failed to direct the work of the court-appointed psychologist and did not adequately investigate Dickens' background. In finding that the new allegations and evidence fundamentally altered Dickens' previously exhausted IAC claim, the Ninth Circuit noted:

> Indeed, the new evidence creates a mitigation case that bears little resemblance to the naked *Strickland* claim raised before the state courts. There, Dickens did not identify any specific conditions that sentencing counsel's allegedly deficient performance failed to uncover. He only generally alleged that sentencing counsel did not effectively evaluate whether Dickens "suffer[ed] from any medical or mental impairment." This new evidence of specific conditions (like FAS and organic brain damage) clearly places Dickens's *Strickland* claim in a "significantly different" and "substantially improved" evidentiary posture.

*Dickens*, 740 F.3d at 1309.

Accordingly, pursuant to *Dickens*, the question of whether *Martinez* should apply to this claim hinges on whether it is fundamentally different one from the one presented in state court. The Court concludes it is not. While the new records confirm his parents' diagnosis of severe mental illness and flesh out the argument petitioner made below, including offering expert opinion about the implications of his mother's illness to his development, where he specifically faulted counsel with failing to investigate and present evidence related to his family's history of mental illness and presented the PCR court with evidence indicating that both parents suffered from schizophrenia, the claim below was far from the naked *Strickland* claim at issue in *Dickens*. Thus, the Court cannot conclude that the new evidence presented here fundamentally alters the original claim such that it constitutes a new, unexhausted claim. Accordingly, in the Court's review of this

claim, it is limited to the record before the Oregon Court of Appeals when it adjudicated this claim on the merits.

There, the court carefully reviewed the steps taken by Ms. Beers to find mitigation evidence, noting that she met with and interviewed petitioner several times, interviewed family members and acquaintances, including petitioner's mother, father, grandmother, uncle, a pediatric dentist, several childhood friends, an employer, a former girlfriend, victims of his assault, and a high-school friend of his sister. In addition, Ms. Beers documented her attempts to interview petitioner's sister, Michelle, and to obtain petitioner's father's hospital records. *Thompson*, 268 Or.App. at 21-22.[20] It also noted that petitioner's counsel "'subpoenaed and ultimately received piles of documentation dating from [petitioner's] childhood on up,'" including "'hundreds of pages of CSD, Juvenile, School, and Medical records regarding petitioner and his background.'" *Id.* While petitioner faults Ms. Beers with failing to locate readily available materials surrounding petitioner's parents' mental illness and additional medical records from his childhood, and with failing to contact doctors and social workers who worked with him at a young age, there is ample support in the record for the Oregon Court of Appeals' determination that she did a "thorough" investigation. Cf. *Porter*, 558 U.S. at 39-40 (Counsel's investigation deficient when he had one

---

[20] While Ms. Beers explained why she was unable to obtain records from petitioner's father's early hospitalization and that she did not seek confirmation of his reported schizophrenia because he indicated it was a self-diagnosis, there is no explanation for why she did not seek to obtain his VA file or petitioner's mother's medical records. The Court agrees with petitioner that there were "flags" that should have alerted petitioner's counsel and Ms. Beers that such investigation might be fruitful, including the fact that petitioner's mother told counsel she had been hospitalized, counsel believed petitioner's mother suffered from mental illness, sporadic notations in petitioner's own records called his mother's mental health into question, and a mitigation checklist in counsel's possession highlighted the particular need to investigate a parent who suffered from schizophrenia.

short meeting with Porter regarding the penalty phase, did not "obtain any of Porter's school, medical, or military service records or interview any members of Porter's family," and "ignored pertinent avenues of investigation").

Certainly, it gives the Court pause to consider what impact presentation of evidence that not one, but *both* of petitioner's biological parents suffered from schizophrenia, as well as other evidence of his troubled background, might have had on individual juror's assessments of petitioner's relative moral culpability as he or she weighed the appropriateness of a death sentence in this case. While the Oregon Court of Appeals did not address individual pieces of evidence, it referenced those portions of Dr. Janzer's testimony it found had touched on the fallout of petitioner's dysfunctional family and the fact that a "mixed-up family setting" always intersects with the kind of severe mental health diagnosis petitioner suffered from. Ultimately, the court concluded that even though petitioner's PCR counsel identified numerous details that trial counsel could have "'handled differently, emphasized or deemphasized, included or excluded during [petitioner's] penalty-phase proceeding," on this record, the handling of such details does not demonstrate that defense counsel failed to exercise reasonable judgment and skill. *Thompson*, 268 Or.App. at 33-34 (quoting *Montez v. Czerniak*, 355 Or. 1, 24-25 (2014)).

Were the Court assessing this claim *de novo* it might reach a different conclusion. But under the highly deferential standards of AEDPA, it cannot conclude that the Oregon Court of Appeals' application of the *Strickland* standard to the issue of counsel's failure to introduce evidence of his troubled family history, including his parents' diagnosis of severe mental illness, even if incorrect, was objectively unreasonable. *See Williams v. Taylor*, 529 U.S. 362, 410, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)(The relevant question is not whether the state court incorrectly

applied *Strickland*, because "an *unreasonable* application of federal law is different from an *incorrect* application of federal law."); *Richter*, 562 U.S. at 105 (The critical question is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."). Accordingly, petitioner is not entitled to relief on this subclaim.

2. <u>Petitioner's counsel rendered ineffective assistance when they allowed damning and misleading evidence from his juvenile court file to be presented by Cathy Hoffard, a social worker who knew nothing of his case and whose testimony would have been inadmissible had counsel objected to it under the Confrontation Clause. (Pet. [43], pp. 175-181).</u>

Petitioner contends that an objection to Ms. Hoffard's testimony on Confrontation Clause grounds would have been successful because there is no evidence in the record showing that the state could have established the unavailability of either the writer of the notes she referenced[21], the sources of the allegations of sex abuse and fire setting, or the treatment providers who purportedly rejected his admission based on these allegations. Petitioner further argues that there is no evidence in the record that he was ever afforded an opportunity to cross the declarants of these testimonial statements that were part of his juvenile-court file. To the contrary, he insists that the only evidence in the record is his own assertions denying any issues around sex abuse or fire setting and reporting that only one program rejected him on this basis.

However, in its PCR trial memorandum, the state argued that counsel acted reasonably in not objecting to Ms. Hoffard reading from petitioner's juvenile file because "the alternative was to force the state to produce the actual witnesses to the incidents described in the reports" and counsel

---

[21] Even though Ari Bercheski, petitioner's former counselor, had died, petitioner contends there is no evidence he actually authored the notations.

reasonably made the tactical decision that it would be less damaging to have one non-victim read the case files.  DR 18-7, p. 157, Ex. 384.

In denying this claim, the PCR court found that "[r]egardless of whether the claims in Par. 41 or 43 describe inadequacy by Counsel (the Court does not find any), the Court finds that it would not have made any difference in the Trial Court's ruling or the outcome of the proceeding." Dr. 18-8, p. 49.  Petitioner can only speculate as to what showing of declarant unavailability, beyond the death of Mr. Bercheski, the state could have made or what percipient witnesses it could have produced were the trial court to disallow Ms. Hoffard's testimony about the contents of his juvenile file.  In addition, as respondent correctly notes, he makes no attempt to show how any failure on counsel's part here made a difference in the outcome of the proceeding.  Accordingly, the Court concludes that he has not demonstrated that the PCR court's denial of this claim was contrary to, or involved the unreasonable application of, clearly established Federal Law, or that it was based on an unreasonable determination of the facts.

3. Petitioner's counsel rendered ineffective assistance when they waived opening statements during the penalty phase of petitioner's trial.  (Pet. [43], pp. 181-84).

Petitioner alleges that it was critical for counsel's opening statements to blunt the prosecution's contentions that petitioner was, and always had been, a vicious, out-of-control person who had committed numerous bad acts before committing the subject offenses.  He insists counsel could have done this by circumscribing the state's arguments, minimizing them when possible, and explaining petitioner's actions through the mental disorder that had plagued him since early childhood.  In addition, petitioner contends counsel could have used the opening statements to outline his good qualities.

While acknowledging that Ms. Dickison did not have an answer as to why they waived the opening altogether, and that she conceded it was a possible she was "giving up," the PCR court relied on co-counsel Mr. Martz's representation that they tactically decided "that the best approach for the penalty phase would be to present the evidence and then provide closing argument pleading for petitioner's life." It found that Mr. Martz credibly averred that in his experience making an opening statement at the penalty phase can be detrimental because it can bolster some of the state's arguments. DR 18-8, p. 48, Ex. 395.[22] Accordingly, the court concluded that counsel were not inadequate in failing to give an opening statement.

In addition, the PCR court found that even assuming counsel rendered inadequate assistance in waiving opening statements,"that inadequacy reasonably would have had no effect on the outcome of the proceedings" because during his allocution, petitioner "all but invited the jury to impose the death sentence." He told the jury that he did not want life without parole—that he would rather be executed, or be released someday, and that if he was sitting on the jury he would vote for the death penalty. *Id*.

Analysis

While counsel's failure to make an opening statement can constitute deficient performance, "[t]he timing of an opening statement, and even the decision whether to make one at all, is ordinarily a mere matter of trial tactics and in such cases will not constitute the incompetence basis

---

[22] Petitioner suggests that the PCR court's reliance on Mr. Martz's "experience" is misplaced because at the time of petitioner's penalty-phase trial, he had never tried a murder case let alone a death penalty case. Because the Court relies on the PCR court's no-prejudice finding to deny relief here, it need not resolve this issue. However, it notes that it is possible Mr. Martz was drawing on experience gained subsequent to petitioner's trial to opine about the approach taken during the penalty phase with respect to an opening statement.

for a claim of ineffective assistance of counsel." *United States v. Rodriguez-Ramirez*, 777 F.2d 454, 458 (9th Cir. 1985).

On this record, and especially considering petitioner's remarks during allocution, he cannot demonstrate that, had his counsel given opening statements in the manner he suggests, there is a reasonable probability that the outcome of his penalty phase proceedings would have been different. Accordingly, petitioner fails to show that the PCR court's no-prejudice determination was contrary to, or involved an unreasonable application of *Strickland*.

4. <u>Petitioner's counsel rendered ineffective assistance when they failed to present any of the abundant testimony available from family members who would be devastated by petitioner's execution, or who had positive testimony about him. (Pet. [43], pp. 195-200).</u>

Petitioner alleges that his sister, Michelle Mason; grandmother, Lucy Cropper; mother, Janet Thompson; stepmother, Erlinda Thompson; half-sister, Mary Kathleen Thompson; and former girlfriend, Barbara Ulen, were available and willing to testify during his penalty phase about the devastation they would feel if petitioner were executed, as well as, to positive aspects of his character and behavior. Petitioner particularly faults counsel with failing to present testimony from Ms. Mason who had grown up with him and could have provided instances of his good behavior and helped to explain his bad behavior given her first-hand knowledge of their severely troubled upbringing and the obvious emotional problems that plagued him from a very early age.

On the issue of counsel's failure to call family members during the penalty phase, the Oregon Court of Appeals found:

***

Petitioner argued that trial counsel provided inadequate assistance of counsel when they failed to call his grandmother, his sister, his half-sister, and his stepmother to

testify about their love for him and the effect that his execution would have on them.

As noted, trial counsel "had hoped to put on [petitioner's] mother and his grandmother and sister, but *** right at the last minute *** decided not to." There was evidence before the post-conviction court that that decision was based, in part, on the ability of the state to elicit harmful testimony from them. As the post-conviction court noted, petitioner's grandmother "had reportedly advised the police that she had always thought that Petitioner would lose his temper and kill her ***. The week Petitioner moved in with her, [she] wrote out her funeral plans for the family, and purchased a cemetery plot." Likewise, trial counsel was concerned that petitioner's sister "might be more harmful than helpful because the prosecution would then be able to examine her about negative incidents involving Petitioner during their childhood." In light of that evidence, the post-conviction court did not err in concluding that trial counsel's decision not to call petitioner's grandmother and sister was protected as a reasonable tactical decision. [The Oregon Court of Appeals noted further that the PCR court had rejected this claim as to Ms. Mason on the additional basis that petitioner had failed to prove that she was available to testify based on Beers' representation that she was unwilling to do so].

As to petitioner's stepmother and half-sister, petitioner argues that, because the record does not establish that trial counsel attempted to contact them, trial counsel could not have made a reasonable tactical decision to forgo calling them as witnesses. Further, petitioner contends that the failure to interview them amounted to unreasonable mitigation investigation and, thus reflected inadequate assistance of counsel. But, even assuming that trial counsel made no attempt to contact petitioner's stepmother and half-sister, that does not, on its face, amount to inadequate assistance of counsel. As the Oregon Supreme Court recently explained:

> "[I]n virtually every complex post-conviction matter, there is always *other* evidence that could have been investigated or introduced. The standard, however, is not whether counsel investigated or introduced every shred of evidence regarding petitioner's background, psychological makeup, or other factors that the jury might possibly have found to be mitigating; rather, the standard under Oregon law is whether petitioner proved by a preponderance of the evidence that his defense counsel failed to exercise reasonable professional skill and judgment."

*Montez*, 355 Or. at 16, 322 P.3d 487 (emphases in the original).

Here, the record supports the post-conviction court's conclusion that petitioner did not make that showing with respect to counsel's alleged failure to investigate

petitioner's stepmother and half-sister. As noted, during her investigation of petitioner, Beers interviewed numerous family members, friends, and acquaintances and developed a file full of mitigation evidence that trial counsel considered to be "a two-edged sword," because it had the potential to harm petitioner's case. Eventually, as Dickison explained, that led trial counsel to stop pursuing that type of mitigation evidence, out of concern that they would discover more damaging information or unearth additional witnesses who would testify on behalf of the state.

In assessing the reasonableness of that decision, we "must make every effort to evaluate [trial counsel's] conduct from [their] perspective at the time, without the distorting effects of hindsight." *Lichau*, 333 Or. at 360, 39 P.3d 851. Doing so, we conclude that the trial court did not err in rejecting petitioner's claim. Faced with a difficult and often uncooperative client, trial counsel engaged in a thorough investigation of petitioner's family members, ultimately finding little useful mitigation evidence. Although, as petitioner notes, trial counsel was aware that petitioner had lived with his stepmother and half-sister "briefly as a teenager," the decision to stop investigating family members did not amount to a failure to exercise reasonable professional skill or judgment.

*Thompson*, 268 Or.App. at 29-30.

<u>Analysis</u>

a. <u>Michelle Mason, Lucy Cropper and Janet Thompson</u>

The Court agrees with petitioner that of all his family members, his sister, Ms. Mason, had the most to offer mitigation-wise in the penalty-phase portion of his trial. First, she could have testified about the extreme family dysfunction she and petitioner lived with as children, particularly given their mother's inability to effectively parent them. Second, she could have testified as to what she observed from a very early age as petitioner's severe emotional disturbance and ongoing mental health challenges. Finally, she could have testified about his good qualities and that she loved him and would be devastated if he were executed.

Ms. Mason's value as a witness notwithstanding, petitioner cannot rebut by clear and convincing evidence the PCR court's factual finding, implicitly adopted by the Oregon Court of

Appeals, that petitioner failed to prove she was available to testify at his penalty phase. On this issue, the PCR court found:

> Ms. Beers credibly testified that she attempted to get a hold of Ms. Mason to interview her, and that on one occasion early on, she met briefly with Ms. Mason and their mother, Janet Thompson, at the residence of Ms. Thompson. Ms. Beers testified that thereafter, she repeatedly and unsuccessfully tried to contact Ms. Mason through the mother (pursuant to specific instructions to Ms. Beers that such was the preferred method of contact).
>
> Contrary to Ms. Mason's otherwise believable testimony, Ms. Beers testified that Ms. Mason did not want to get involved in the case, and that she did not speak to Ms. Beers. Ms. Mason agrees that she made no attempt to get hold of Counsel, before or during the penalty phase, although she attended the penalty phase of February 15, 1995. She left that hearing after watching Petitioner address the jury (Ex. 47, Mason Affidavit, page 2, par. 4).
>
> Regardless of the other evidence regarding Ms. Mason, and the Court's finding above, Mr. Martz credibly testified that Counsel spoke with Ms. Mason before Trial and that she indicated that she did not want to be involved in the case (Ex. 116, Martz Affidavit, page 7, par. 20).

DR 18-8, p. 56, Ex. 395.

Petitioner acknowledges that Mr. Martz stated in his affidavit (which apparently was drafted by a representative of the state) that someone from the defense team talked to Ms. Mason and that as he recalls, she did not wish to be involved. However, petitioner notes that in Mr. Martz's live testimony under oath he stated that he believed Ms. Mason was willing to do anything to help, but that counsel had a concern about her testifying. Pet. [43], p. 166. Similarly, Ms. Dickison testified that they were worried about evidence the prosecution could elicit from Ms. Mason and that her testimony would do more harm than good. She did not suggest that the reason they did not call Ms. Mason was because she did not want to be involved in the case. *Id*. at 167. Petitioner raises valid questions about the PCR court's finding that he failed to prove Ms. Mason was available to testify at his penalty-phase trial. Given the PCR court's respective credibility

findings concerning Ms. Beers and Ms. Mason on this issue, however, these questions fall short of rebutting the presumption of correctness due that finding by clear and convincing evidence.[23]

Alternatively, even assuming Ms. Mason was willing and available to testify, evidence in the record confirms the legitimacy of counsel's fear that the state could have elicited damaging testimony from her about petitioner's violent episodes in their childhood. For example, during the PCR proceedings, Mr. Martz recounted an incident wherein petitioner, not be deterred by a locked door, crawled through a heating duct in order gain access to a family member he wished to assault.

Petitioner insists that evidence from these family members was necessary to humanize him and evoke compassion and empathy from the jury. In addition, he suggests that so much evidence of petitioner's violence, including with family members, had already been presented to the jury that it was not reasonable strategy for counsel to forego the benefits of mitigating evidence from these witnesses to avoid potential harm from their cross examinations. Indeed, he maintains that their willingness to testify to their love for him and the devastation they would feel if he were executed, despite these terrible experiences, could have sent a powerful message to the jury about the value of his life.

While the Court agrees that the state had already introduced a great deal of evidence showing petitioner's potential for violence in all corners of his life, including with family members, it will not second guess counsel's determination that opening the door to still more accounts of violence like the ones discussed above was not worth the potential benefit these witnesses'

---

[23] The Court also notes that Ms. Mason's apparent unwillingness to cooperate with the defense team would have curtailed counsel's ability to learn the details, which she later provided during the PCR proceedings and again in this federal action, of just how valuable a witness she might have been.

testimony. Thus, the Court concludes that reasonable counsel could have weighed the potential benefits and harms arising out of petitioner's family's testimony and tactically decided to put them on the stand, or not. This analysis applies equally to petitioner's mother and grandmother.[24] Accordingly, petitioner cannot demonstrate that the Oregon Court of Appeals' determination that counsel did not render deficient performance when they made a tactical decision not put these family members on the stand was contrary to, or involved the unreasonable application of, clearly established Federal Law, or that it was based on an unreasonable determination of the facts.

b. Erlinda Thompson and Mary Kathleen Thompson

According to petitioner, his stepmother and half-sister were available to testify that around the time petitioner was sixteen he lived with their family for several-months and was never violent or caused any problems. To the contrary, they would have testified that he seemed happy and was helpful around the house. In addition, they would have testified that petitioner's execution would devastate them.

As noted above, the Oregon Court of Appeals determined that counsel acted reasonably when, after interviewing numerous family members, friends and acquaintances, they found themselves with a file full of double-edged sword mitigation evidence, they directed Ms. Beers to discontinue her efforts to find additional mitigation witnesses. Petitioner contends that Ms. Beers' "disdain" and "contempt" for him led her to talk to his enemies instead of his friends and family, and led her away from the "warm feelings" felt for him by his sister, mother, grandmother,

---

[24] In addition to the above account of Ms. Cropper's fear that petitioner would kill her and her purchase of a cemetery plot, the PCR court noted that Janet Thompson had advised police that he threatened the whole family and had kicked his grandmother in the past. DR 18-8, p. 55, Ex. 395.

stepmother and half-sister. The record does not support this assertion. To the contrary, it establishes that Ms. Beers repeatedly tried to contact Ms. Mason, did interview many of petitioner's family and friends, and stopped looking for mitigation witnesses because *counsel* directed her to do so. From counsel's standpoint, Ms. Beers' efforts, at best, were yielding witnesses whose testimony they feared could do more harm than good; and at worst, were yielding witnesses who not only refused to cooperate with the defense, but who wanted to seek out the prosecution to assist in their case against petitioner.

As the Oregon Court of Appeals recognized, there is always *other* evidence that could have been investigated and introduced, but a petitioner cannot show that his counsel were ineffective merely by pointing to the existence of such evidence. Instead, the court must assess whether counsel's performance -- in this case, counsel's decision to halt its search for additional mitigation witnesses -- fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 686-87. In making this assessment, the Court must strongly presume counsel's actions falls within the "wide range of reasonable professional assistance." *Id*. at 689.

For the reasons discussed above, the Court concludes that petitioner cannot show that the Oregon Court of Appeals' resolution of this claim was contrary to, or involved the unreasonable application of, clearly established Federal Law, or that it was based on an unreasonable determination of the facts.

c.  <u>Barbara Ulen</u>

The state called Ms. Ulen to testify in the penalty phase. The Court has reviewed her testimony, including the cross examination by defense counsel. DR 18-27, pp. 184-211, Ex. 487. Ms. Ulen's testimony exemplifies the kind of "two-edged sword" mitigation evidence Mr.

Martz worried about. She testified that she still cared about petitioner, confirmed he was capable of genuine feelings, described his ability to be loving and caring, stated that she did not feel he was a non-redeeming, non-caring person, and noted that she thought he was looking for help. However, she also testified extensively about his violent side and the deterioratingly abusive relationship she had with him.

While petitioner faults counsel with failing to specifically draw out of Ms. Ulen how upset she would be if he were to receive the death penalty, the Court concludes that Ms. Dickison adequately elicited testimony from her making the point that she cared about petitioner and thought his life had redeeming value. Ms. Dickison referenced Ms. Ulen's positive sentiments in her closing arguments. The state courts did not specifically address counsel's adequacy in drawing mitigating evidence from Ms. Ulen. Nevertheless, even on *de novo* review, the Court concludes that petitioner cannot demonstrate that he is entitled to relief on this claim. The Court denies it on the merits.

5. Petitioner's counsel rendered ineffective assistance when she gave a perfunctory and damaging closing argument. (Pet. [43], pp. 200-03).

Petitioner faults counsel with parroting the prosecution's language in referring to him as "vicious," and her own expert when she noted that he only knew how to hate, stab, fight and argue. Though petitioner acknowledges that she told the jurors he did have feelings and was not a vegetable with no moral code, he suggests that she was ineffective in barely referencing his mental and emotional issues and leaving the jury with little reason to spare his life. In its denial of this claim below, the PCR court found:

> Petitioner would have this Court find the words "vicious person" used by Trial Counsel in closing when referring to Petitioner's allocution statement describing himself to the jury, amounts to constitutionally inadequate counsel because the

words actually used by Petitioner to describe himself were "violent" and "bad". The dictionary and common usage differences in those words are not sufficient to establish a claim for constitutionally inadequate counsel.

In what amounted to a very difficult case for the defense, after conceding that Petitioner would be locked up for a long time, Counsel otherwise reasonably agreed that Petitioner had potential for possible treatment and change in prison (a matter that, despite Petitioner's rather bold opposing positions, Petitioner himself also allocated for). This claim fails.

DR 18-8, p. 60, Ex. 395.

The Court has reviewed counsel's closing argument. DR 18-29, pp. 89-100, Ex. 487. While another attorney may have made different strategic choices in closing argument, petitioner has not overcome the presumption that counsel's tactics might be considered sound trial strategy. Accordingly, petitioner cannot show that the PCR court's denial of this claim was contrary to, or involved an unreasonable application of, *Strickland*.

6.  <u>Petitioner's counsel rendered ineffective assistance when he failed to provide him with assistance prior to allocution. (Pet. [43], pp. 203-07).</u>

Petitioner argues that Mr. Martz told him that he had the right to allocate, but gave him no real guidance before he exercised his right and no one scripted a statement for him. Respondent notes that petitioner merely reiterated the arguments that he made before the PCR trial court, but does not argue or show how that courts rejection of this claim involved an unreasonable application of federal law or was based on an unreasonable determination of the facts.

The PCR court extensively analyzed this claim. It found that "[c]learly, Counsel and Petitioner discussed the right of allocution several times, and at least generally the content of allocution." After briefly summarizing petitioner's catastrophic allocution wherein the court found that, at best, he sent mixed messages and, "indeed, he gave the jurors several things that could be

described as completely inconsistent with a plea for life, including his take on how three of the four assaults occurred." It noted:

> Petitioner now would hold Trial Counsel responsible for his choices of words. Mr. Bostwick, an attorney who spoke in favor of the practice of writing out a capital defendant's allocution statement, suggested that it must be carefully prepared. His suggestion might be effective if the client is trusting and at least somewhat under control.

> If there is a legal requirement that Counsel prepare a written statement for Petitioner (the Court does not find such), the Court finds that any suggestion that Petitioner would have cooperated and followed a script from lawyers he then said that he did not trust, does not make sense. The Court finds that even if a scripted allocution had been carefully crafted for use by Petitioner, Petitioner would not have trusted it, and such would have been no benefit to Petitioner's case. By his complete thoughts and definite expression with conviction, Petitioner's words were not mistakes that resulted from lack of preparation or oversight (as might be likened to some form of Freudian slip), to the contrary, Petitioner's word choices were careful and sober words of defiance. This was a man who, contrary to common sense, tried to control his Trial in virtually all respects, to the point of unreasonably attempting to control the selection of his attorneys and his experts (including physical threats to toward at least one attorney and one expert), and in the end, also contrary to logic, his jury.

> Mr. Martz credibly testified that he prepared Petitioner before he exercised his right to allocution. He advised Petitioner to apologize to the jury for the murders, and to accept responsibility. He asked Petitioner to plead for his life. He asked him to advise the jury that Petitioner would accept whatever programs would be necessary to rehabilitate him. Petitioner did not take the advice. The claim fails.

DR 18-8, 54-56, Ex. 395.

Respondent arguments are well taken. Petitioner cannot show that the PCR court's denial of this claim was contrary to, or involved an unreasonable application of, clearly established Federal Law or that it was based on an unreasonable determination of the facts.

7. Petitioner's counsel rendered ineffective assistance when she failed to request a provocation instruction with regard to the victim McDonald. (Pet. [43], pp. 207-10).

According to petitioner, Ms.Dickison expressly requested that the provocation instruction not be given on the aggravated murder count involving McDonald. He suggests that this was error because although his allocution supported a provocation instruction, the court's failure to instruct on provocation prevented the jury from mitigating the homicide on that basis.

In denying this claim, the PCR court found:

There were no facts supporting provocation or a jury instruction on provocation. As described in Mr. Martz's affidavit, Trial Counsel reasonably believed (and this Court agrees) that there was no record of any provocation to support a jury instruction on provocation. Petitioner left the tavern and was free of any contact or concern with those inside; he chose to return and purposely initiate a fight and stabbing of Mr. McDonald 14 times, with that decision leading to the stabbing of Debra Oyamada 2 times and Bill Jones 6 times.[25]

DR 18-8, p. 60, Ex. 395.

The Court's review of the record leads to the conclusion that counsel could have reasonably believed that the facts here did not warrant an instruction on provocation with regard to McDonald murder. In addition, not having a provocation instruction allowed Ms. Dickison, in addition to arguably bolstering her credibility with the jury, was able to draw a contrast in her closing arguments between the McDonald murder, where there was not credible evidence of provocation and the Whitcher murder where at least a plausible argument for provocation could be made based on bar patrons' reporting that Whitcher made remarks indicating he was carrying a weapon. DR 18-29, p. 96, Ex. 487. Accordingly, the Court concludes that petitioner cannot demonstrate that

---

[25] The PCR court goes on to make a similar case regarding the Whitcher murder, apparently mistaken about the fact that the provocation instruction *was* given with regard to Whitcher.

PCR court's denial of this claim was contrary to, or involved the unreasonable application of, clearly established Federal Law, or that it was based on an unreasonable determination of the facts.

8. <u>Petitioner's counsel rendered ineffective assistance when they failed to present readily available evidence countering the prosecution's argument that petitioner would pose a danger to others in the future. (Pet. [43], pp. 210-14).</u>

According to petitioner, counsel failed to present expert testimony like that presented by Dr. Cooley during his PCR proceedings, about:  (1) the ample resources available in Oregon maximum security prisons to manage and address any security concerns petitioner might pose; (2) actuarial prediction methodology techniques and their application to predicting future dangerousness; (3) the fact that a high percentage of inmates have personality disorders and there is no correlation with such diagnosis and future dangerousness;  (4) how murder convictions do not make it more likely that a petitioner would be dangerous in prison; and (5) how behavior in the community or in jail (a temporary placement) does not correlate with behavior in prison (base rate evidence).

In denying this claim, the PCR court reiterated its earlier conclusion that counsel's strategy to focus on future dangerousness and ask the jury to accept that petitioner's "mental disorder (root of [his] violent behavior) + treatment in a controlled environment (prison) = elimination of the continuing threat of violence by petitioner," was reasonable.  It noted that simply because "a different tack might have been taken with the mental health experts, as petitioner suggests, does not render counsel's legitimate tactical choice unreasonable."  In addition, with regard to petitioner's assertion that counsel should have presented evidence that prison assaults are rare and that violence is prison is less frequent than in the community, it determined that such "base rate" evidence would have little relevance in petitioner's sentencing proceeding, "given petitioner's

extensive history of violence – assaultive and threatening conduct – in incarcerated settings (at penalty phase, the state presented evidence of petitioner's many incidents of violence and threats of violence against others in both prison and jail (Tr 931-1001))."  Accordingly, the PCR court concluded that counsel reasonably discounted the value of that evidence.  DR 18-9, pp. 14-15, Ex. 402.

Though petitioner faults the PCR court with not distinguishing available security resources in jails versus prisons, the Court finds that its determination that base rate evidence would have been of limited use in petitioner's case given his history of violence in custody is well taken.  Dr. Janzer testified that petitioner's disorder was treatable, that he would likely age out of his violent tendencies, and, that contrary to Dr. Hulteng's assertions, there was no scientific basis for making future dangerousness predictions.  Dr. Colistro bolstered the argument that treatment for petitioner was available and possible.  Though petitioner contends there were additional points counsel could have raised to counter the prosecution's future dangerousness argument, he cannot show that the PCR court's denial of this claim was contrary to, or involved an unreasonable application of, clearly established Federal Law.

**K. Fourteenth Claim:  Oregon's 1991 Death Penalty Scheme is Unconstitutional**[26]

Petitioner alleges that Oregon's 1991 Death Penalty Scheme violates the Fifth, Sixth, Eighth and Fourteenth Amendments in that:  (1) it fails to provide any rational and objective criteria to narrow the death-eligible class; (2) it fails to provide a constitutionally sufficient method for guiding a jury's discretion in choosing who, among the eligible class, should actually receive the death penalty; and (3) it is inconsistent with the Oregon constitution and deprives death-sentenced defendants of liberty interests and protections guaranteed to every other criminal defendant in Oregon.

Respondent contends that petitioner has failed to show that the Oregon Supreme Court unreasonably applied clearly established Federal Law when it determined that Oregon's scheme properly narrows the class eligible for the death penalty.  And, noting that petitioner's argument pertaining to how Oregon's scheme guides the jury's discretion rests entirely on his complaints about the penalty-phase future dangerousness question, respondent maintains that petitioner has failed to show that the Oregon Supreme Court unreasonably applied clearly established Federal

---

[26] The Court notes that effective September 29, 2019, the Oregon legislature passed Senate Bill ("SB") 1013 which dramatically narrowed the set of circumstances that meet the definition of aggravated murder and removed the "future dangerousness" penalty-phase question from jury consideration.  With the exception of petitioner, all other capital habeas petitioners in the District of Oregon moved to stay their cases in order to return to state court to raise claims, including federal constitutional claims, arising out of the passage of SB 1013.  The district judges assigned to those cases granted the motions.  *See Simonsen v. Premo,* Case No. 3: 15-cv-01426-HZ (D. Or. Oct. 1, 2019) (stay order); *Cunningham v. Kelly,* Case No. 3: 04-cv-00261-SI (D. Or. Nov. 8, 2019) (stay order); *Hale v. Premo,* Case No. 3: 15-cv-00251-HZ (D. Or. Nov. 27, 2019) (stay order); *Montez v. Premo,* Case No. 3: 14-cv-01551-MC (D. Or. Dec. 23, 2019) (stay order); *Hayward v. Premo*, Case No. 3:  13-cv-01792-SI; and *Lotches v. Premo*, Case No. 6:  14-00369-MO (D. Or. Feb. 10, 2020) (stay order).  Though petitioner references some legislative history presented in the lead up to the passage of SB 1013, particularly on the issue of future dangerousness, he does not raise, and the Court does not address, any claims based on the passage of SB 1013 in these proceedings.

Law when it determined that usage of the Second, so-called "future dangerousness," Question during the penalty phase was not unconstitutional.[27]

<u>Narrowing the Eligible Class</u>

Petitioner insists that the State legislature must, as an initial matter, enact legislation narrowing the death-eligible class by establishing statutory aggravating circumstances. Citing *Gregg v. Georgia*, 428 U.S. 153, 222, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), he argues that proper legislative narrowing leaves only the most serious cases for death penalty consideration such that juries will impose death in a "substantial portion" of these cases, thereby making its imposition less "wanton and freakish."

Notwithstanding the Oregon Supreme Court's reliance on *Jurek* and *State v. Wagner*, 309 Or. 5 (1990)("*Wagner II*") to declare Oregon's death penalty scheme constitutional, petitioner maintains that Oregon's scheme differs critically from the one approved in *Jurek*. First, he contends that the Texas legislature defined aggravated murder at the outset to narrow the group of murderers eligible for the death penalty to intentional and knowing murders committed in five discrete situations and representing those guilty of the most brutal crimes. Thus, he maintains the Texas legislature, in accordance with *Pulley v. Harris*, 465 U.S. 37, 49-50, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), accomplished sufficient narrowing of the eligible class before any penalty proceedings commenced and before the question of future dangerousness arose.

---

[27] The penalty phase questions consisted of the following: **First Question:** Was the conduct of the defendant that caused the victim's death committed deliberately and with the reasonable expectation that the death of victim would result? **Second Question:** Is there a probability - meaning is more likely than not - that the defendant would commit criminal acts of violence that would constitute a threat to society? **Third Question:** Was the conduct of defendant in killing the victim unreasonable in respect to the provocation, if any, by the victim? **Fourth Question:** Should the defendant receive a death sentence? *See* Or. Rev. Stat. § 163.150(1)(b)(A-D).

In contrast, petitioner argues that a death-sentenced individual in Oregon has been "struck by lightning" in the *Furman* sense in that he or she is one of a small percentage of convicted murderers in Oregon over the past several decades to receive the death penalty. He asserts that Oregon's statutes fail to narrow the class of death-eligible murders at all, leaving high numbers eligible, but few chosen for a death sentence and those for unarticulated and often perplexing reasons. In addition, he argues that Oregon's scheme, unlike the one approved in *Jurek*, blurs the line between eligibility and selection because future dangerousness plays a vital role in both stages. He even suggests that in Oregon future dangerousness is an element of the underlying crime even though the Supreme Court has held that future dangerousness is not an appropriate question to determine guilt of a criminal act. *See Simmons v. South Carolina*, 512 U.S. 154, 163, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994); *Sattazahn v. Pennsylvania*, 537 U.S. 101, 112, 123 S.Ct. 732, 154 L.Ed.2d 588 (2003).

Analysis

> To be eligible for the death penalty, the defendant must be convicted of a crime for which the death penalty is a proportionate punishment. To render a defendant eligible for the death penalty in a homicide case, we have indicated that the trier of fact must convict defendant of murder and find one "aggravating circumstance" (or its equivalent) at either guilt or penalty phase. The aggravated circumstance may be contained in the definition of the crime or in a separate factor (or both). As we have explained, the aggravating circumstance must meet two requirements. First, the circumstance may not apply to every defendant convicted of murder; it must apply only to a subclass of defendants convicted of murder. Second, the aggravating circumstance may not be unconstitutionally vague.

*Tuilaepa v. California*, 512 U.S. at 971-73 (1994)(citations omitted).

In *Loving v. United States*, 517 U.S. 748, 755, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996), the Supreme Court discussed death penalty eligibility as follows:

The Eighth Amendment requires, among other things, that "a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" Some schemes accomplish that narrowing by requiring that the sentencer find at least one aggravating circumstance. The narrowing may also be achieved, however, in the definition of the capital offense, in which circumstance the requirement that the sentencer "find the existence of the aggravating circumstance in addition is no part of the constitutionally required narrowing process."

The Court held that the legislature may itself narrow the definition of capital offenses so that a jury finding of "guilty" establishes eligibility or the legislature may define capital offenses more broadly and provide for narrowing by the jury finding aggravating circumstances at the penalty phase. *Lowenfield v. Phelps*, 484 U.S. 231, 246, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988).

Here, petitioner's arguments notwithstanding, I am satisfied that, like the Texas scheme it is modeled after and that the Supreme Court approved in *Jurek*, Oregon's scheme adequately narrows the eligible class via its statutory definition of aggravated murder. Regardless of Texas' definition of aggravated murder setting forth "five situations" under which a defendant might be eligible for the death penalty at the time of *Jurek* was decided, its current scheme set out at Tex.Penal Code § 19.03 (2011) and Oregon's 1991 schemes are similar in both number and kind of provisions allowing for an aggravated murder charge. One notable difference involves Or. Rev. Stat. §163.095(2)(e) defining aggravated murder as murder "committed in an effort to conceal the commission of a crime, or to conceal the identity of the perpetrator of a crime." At first blush, this provision appears to be quite broad. However, in addressing the question of whether it was unconstitutionally broad, the Oregon Supreme Court determined that the provision "requires proof that the murder was committed intentionally and for a specific purpose – to conceal the commission of a separate crime or the identity of the crime's perpetrators." *State v. Farrar*, 309

Or. 132, 187-88 (1990). Moreover, it specifically held that the provision could not be applied to all or almost all murders and that it genuinely narrowed the class of persons eligible for the death penalty. *Id*.

In addition, in *State v. Wagner*, 305 Or. 115, 148 (1988)("*Wagner I*"), the court rejected the argument that Oregon's scheme offends the Constitution because it "has made so many murders 'capital murders' that the pool is not sufficiently narrowed to pass muster under the Eighth Amendment of the Constitution of the United States." Noting that the assertion that Oregon's law allowed the death penalty for 26 types of killings involved "overcount[ing]" by adding in the nine types of felony murder and the separate categories of victims, it found:

> Oregon's ten kinds of aggravated murder narrow the pool in the manner approved in *Jurek v. Texas, supra*, and compare favorably in number with the 10 sentencing aggravating factors of the Georgia statute approved in *Gregg v. Georgia, supra*, and with the eight sentencing factors of the Florida statute approved in *Proffitt v. Florida, supra*.
>
> ***
>
> We conclude that Oregon's statutory provisions for narrowing the pool of those on whom the death penalty may possibly be visited if found guilty of aggravated murder meets the requirements of the Supreme Court of the United States in these cases arising out of Texas, Georgia and Florida.

*Id*. at 148-49.

State courts are the ultimate arbiters of state law. Accordingly, this court must defer to the Oregon Supreme Court's interpretation of its own laws, including Or. Rev. Stat. §163.095, the statute setting out the specific types of aggravated murder in Oregon. Moreover, *Wagner I* confirms that "[t]he aggravating factor is built into the definition of the crime of which a defendant must be convicted before sentence of death may even be considered." *Id*. at 144.

Petitioner notes that respondent suggested in *Williams v. Belleque*, Case No. 3: 03-01678-JO that Oregon's scheme appropriately narrows the eligible class because less than 2% of individuals who committed homicide in Oregon over the past 25 years were convicted of aggravated murder and sentenced to death. Petitioner insists this representation supports his position that Oregon's scheme is unconstitutionally arbitrary and capricious in the *Furman/Gregg* sense because such a small percentage of death-eligible murderers are convicted and sentenced to death. The referenced statistic, however, which looks at *all* homicides rather than at the subset of murders that could be charged as aggravated murder, by itself, neither establishes that Oregon's scheme sufficiently narrows the eligible class; nor, as petitioner suggests, establishes that an unconstitutionally low number of murderers statutorily eligible to be charged with aggravated murder are convicted and sentenced to death.

Finally, the Court addresses petitioner's argument that Oregon's system is distinguishable from the one approved in *Jurek* because Oregon uniquely blurs the line between the eligibility and selection stages because it views the issue of future dangerousness as vital to both. He argues that respondent has previously stated that the "narrowing" process occurs in both the guilt-phase factual determination of whether a defendant committed aggravated murder and in the penalty-phase factual determination of whether the prosecution can prove the first three penalty-phase questions, including whether the defendant poses a future danger. He insists that this contrasts starkly with Texas' scheme where the jury does not consider the penalty-phase questions until after narrowing has occurred.

As noted above, Oregon's scheme sufficiently narrows the eligible pool via its statutory definition of aggravated murder, *prior* to the jury's consideration of any of the penalty-phase

questions.  As is the case in Texas, the jury does not take up any penalty-phase questions unless it finds the defendant guilty of aggravated murder.  Accordingly, the Court wholly rejects petitioner's suggestion that future dangerousness has been "freighted" to the guilt-phase eligibility stage and become an element of the offense of aggravated murder.

Petitioner refers to respondent's representation in *Williams* that additional narrowing occurs during the penalty phase because were the jury answer one of the first three penalty-phase questions "no," including the future dangerousness question, the defendant would not be *eligible* for a death sentence.  While the Court understands that under relevant Federal Law these types of penalty-phase questions are typically viewed as part of guiding the jury's discretion (the selection phase), rather than part of narrowing the eligible class (the eligibility phase), there is some understandable conflation between these concepts.  *See, e.g., Lewis v. Jeffers*, 497 U.S. 764, 774, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990)("A State's definitions of its aggravating circumstances-those circumstances that make a criminal defendant 'eligible' for the death penalty-therefore play a significant role in channeling the sentencer's discretion.").  Nevertheless, regardless of any past conflation on respondent's part, the Court is satisfied that the manner in which Oregon's scheme narrows the eligible class does not differ in a constitutionally significant way from the scheme approved in *Jurek*, and petitioner cannot demonstrate that the Oregon Supreme Courts denial of this subclaim was contrary to, or involved an unreasonable application of, clearly established Federal Law.

## Future Dangerousness

As noted above, petitioner asserts that Oregon's death penalty scheme fails to guide the jury's discretion resulting in an arbitrary and capricious selection of the "handful" of individuals

sentenced to death.  Specifically, he contends that the Oregon courts have refused to provide a narrowing definition of "future acts of violence," and they have interpreted future dangerousness far more broadly than did the Texas courts discussed in *Jurek*.

For example, he asserts the Oregon Court of Appeals approved instructions that allowed the jury to find a defendant a risk of being a future danger based on the possibility that he might *threaten* a violent act.  *See Cunningham v. Thompson*, 62 P.2d 823, 844-45 (Or. Ct. App. 2003). The Oregon Supreme Court has also allowed evidence of membership in a white supremacist gang and Nazi beliefs to prove future dangerousness.  *See State v. Moore*, 927 P.2d 1073, 1090 (Or. 1996); *State v. Fanus*, 79 P.3d 847, 862-64 (2003).  Ultimately, petitioner argues that the breadth of Oregon's future dangerousness jurisprudence has left prosecutors with unfettered discretion to argue that an individual poses a future danger.  He insists Oregon's interpretation of future dangerousness is so broad it renders it meaningless and unconstitutionally vague.  Moreover, he argues the lack of evidentiary restraints in Oregon penalty phase trials make Oregon's use of future dangerousness contrary to *United States v. Booker*, 543 U.S. 220, 231, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005) which requires constitutional protections and procedural safeguards apply equally to facts presented to establish a sentence, including a death sentence.

Finally, petitioner maintains that the overwhelming evidence that Oregon's future dangerousness provision does "nothing to predict violence, and much to smear the accused," prompted the Oregon legislature to eliminate the future dangerousness question in its passage of SB 1013.  He contends that the legislative history of 1013 exposes the inability of capital juries to accurately predict future prison violence -- unless they were predicting a *lack* of dangerousness.

<u>Analysis</u>

The Supreme Court has long settled the legitimacy of future dangerousness as an appropriate aggravating factor in capital cases. *See Simmons v. South Carolina*, 512 U.S. 154, 162 (1994); *Tuilaepa v. California*, 512 U.S.967, 979 (1994); *Barefoot v. Estelle*, 436 U.S. 880, 896-97 (1983); *Jurek*, 428 U.S. at 274-76. Moreover, the Court has repeatedly rejected arguments that future dangerousness evidence is unconstitutionally arbitrary or unreliable.

As noted above, petitioner seeks to distinguish Oregon's use of future dangerousness in the penalty phase of death-penalty cases from that of Texas by suggesting that in Oregon the state courts allow in far broader and less reliable evidence to support the future dangerousness determination than is allowed under the Texas scheme.

As a preliminary matter, a federal habeas court does not review whether evidence was introduced in violation of state law. *Estelle*, 502 U.S. at 67-68. Rather it reviews state evidentiary rulings only to determine if they violate the petitioner's due process rights. To that end, the Court is persuaded by the Tenth Circuit's examination of this issue:

> The Supreme court [] has [n]ever held that admitting evidence at sentencing that tends to prove the defendant engaged in other unadjudicated criminal conduct infringes on the defendant's presumption of innocence pertaining to the other unadjudicated conduct. Instead, the Supreme Court [] ha[s] repeatedly held that the district court may admit evidence of such unadjudicated conduct in the penalty phase of a capital trial without violating the defendant's constitutional rights. *See Williams v. New York*, 337 U.S. 241, 244, 252, 69 S.Ct. 1921, 128 L.Ed.2d 745 (1949)(upholding the trial judge's consideration in imposing the death sentence of evidence the defendant had committed burglaries for which he had not been convicted); *Nichols v. United States*, 511 U.S. 738, 747, 114 S.Ct. 1921, 128 L.Ed.2d 745 (1994)(citing *Williams* with approval, in a non-capital case, for the proposition that the Court has upheld the constitutionality of considering unadjudicated conduct at sentencing).

*U.S. v. Lujan*, 603 F.3d 850, 856 (10ᵗʰ Cir. 2010). The Supreme Court has stressed that a capital jury should receive "as much information as possible when it makes the sentencing decision." *Gregg v. Georgia*, 428 U.S. 153, 204 (1976); *see also United States v. Jacques*, 684 F.3d 324, 327 (2d Cir. 2012)("Generally, more evidence, not less, should be admitted on the presence or absence of aggravating and mitigating factors in the penalty phase of a capital case.")(internal quotations omitted).

Moreover, in *Barefoot*, the Court allowed testimony on future dangerousness because it found that: (1) consistent with findings in Jurek, a lay jury is capable of answering the question on future dangerousness; (2) the fact finder can determine the weight to give the evidence; and (3) it was not persuaded that testimony on future dangerousness was almost entirely unreliable or that the fact finder and the adversary system would not be competent to uncover, recognize and take due account of its shortcomings. 463 U.S. at 899. Balancing the danger of undue prejudice, a defendant has wide latitude in the penalty phase of a capital case to contest evidence and put on his own evidence showing he does not pose a future danger. The Supreme Court's consistent approval of jury consideration of the question of future dangerousness suggests that the burden to prove this factor can indeed be satisfied, despite reliability concerns inherent in future dangerousness evidence.

The Court turns next to petitioner's assertion that the future dangerousness question as it plays out in Oregon is unconstitutionally vague. An aggravating circumstance is unconstitutionally vague when it does not "'channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance and that make rationally reviewable the process for imposing a sentence of death.'" *Lewis v. Jeffers*, 497 U.S. 764, 774 (1990)(quoting

*Godfrey v. Georgia*, 446 U.S. 420, 428 (1980)); see also United States v. Stone, 2013 WL 6799119 at *3 (E.D.Cal. Dec. 20, 2013)(summarizing the "ample authority" upholding future dangerousness factor and concluding that it is not "'too vague to provide guidance to the sentencer.'")(citations omitted).   Relying on Jurek, the Oregon Supreme court in Wagner I rejected arguments that Oregon's statute is unconstitutionally vague because future dangerousness is not susceptible to prediction.   Furthermore, that court rejected defendant's claim that the trial court erred in not instructing the jury that "criminal acts of violence," as set out in ORS 163.150(1)(b)(B), referred to a "relatively narrow" range of conduct likely to result in physical injury to persons as follows:

> ORS 163.150(1)(b)(B), which required the jury to consider the likelihood that defendant would commit such acts in the future, did not so limit the jury's inquiry. This court has held that ORS 163.150(1)(b)(B) reflected an intent that information provided to the jury on the question of defendant's prior criminal conduct be "broad in scope."   *State v. Moen, supra*, 309 Or. at 72, 786 P.2d 111.   Similarly, ORS 163.150(1)(b)(B)(1987) permitted the jury to consider a broad range of possible future acts of criminal violence, as those words are commonly understood, as it deems relevant in addressing the inquiry required by the statute.   *See State v. Wagner*, 305 Or. 115, 152, 752 P.2d 1136 (1988)(*Wagner I*)(statutory term is not indefinite, because it restrict the jury to consideration of acts of *criminal* violence).

*State v. Tucker*, 315 Or. 321, 337 (1993).

Here, petitioner's vagueness challenge is based on an assertion that Oregon courts interpret the future dangerousness question far more broadly than what the Supreme Court deemed permissible.   For the reasoned discussed above,  however, the Court concludes that petitioner has not established that Oregon's use of future dangerousness differs significantly from the way Texas uses it.   As it is well settled that Texas' use passes constitutional muster, the Court concludes Oregon's use cannot be challenged on vagueness grounds.

Finally, the Court declines to consider SB 1013's legislative history in resolving this claim because in determining whether the Oregon Supreme Court's denial of this claim was contrary to,

or involved the unreasonable application of, clearly established Federal Law, my review is limited to the record that was before the Oregon Supreme Court at the time it adjudicated this claim on the merits. *Pinholster*, 563 U.S. at 181.

Based on the foregoing, the Court concludes that petitioner cannot demonstrate that the Oregon Supreme Court's determination that Oregon's use of future dangerousness is not unconstitutional is contrary to, or involved an unreasonable application of, clearly established Federal Law. I deny this subclaim.

### Oregon's Death Penalty Scheme is Inconsistent with the Oregon Constitution

Petitioner alleges that Oregon's capital scheme deprives death-sentenced defendants of liberty interests and protections guaranteed to every other defendant in Oregon. He further contends that these inequities are exacerbated by the fact that the scheme fails to provide for substantive review to determine whether a defendant should have been charged with a capital crime or ultimately deserved the death penalty compared to other murderers. Respondent argues that petitioner failed to present this claim to the Oregon Supreme Court on direct review. In his responsive brief, petitioner does not dispute that this subclaim is defaulted, but my review of Appellant's Opening Brief on direct appeal reveals that in Assignment of Error No. 15 challenging the constitutionality of Oregon's death penalty statutes petitioner alleged that Article I, section 40's selective suspension of sections 15 and 16 violates equal protection under the Fourteenth Amendment and that the Oregon statutory scheme denies a capital defendant comparative sentence review and creates disproportionate selection procedures. DR 18-3, p. 220, Ex. 259. Accordingly, the Court disagrees that this subclaim is defaulted.

<u>Analysis</u>

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. V. Cleburne Living Center*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982). However the Court recognizes that "the penalty of death is qualitatively different from a sentence of imprisonment, however long" and "[b]ecause of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976).

The Ninth Circuit has rejected an equal protection challenge to a state rule allowing for different deadlines in capital and non-capital petitions. *See Rhoades v. Henry*, 638 F.3d 1027, 1055 (9th Cir. 2011)(rejecting due process and equal protection challenge to Idaho statute "which imposes a forty-two day time limit for the filing of post-conviction proceedings in capital cases whereas non-capital defendants have five years within which to pursue post-conviction relief."), citing *Hoffman v. Arave*, 236 F.3d 523 (9th Cir. 2001). Moreover, there are procedural protections afforded capital defendants that are not provided to non-capital defendants. *Compare Beck v. Alabama*, 447 U.S. 625, 638 (1980)("[I]f the unavailability of a lesser included offense instruction enhances the risk of unwarranted conviction, [the State] is constitutionally prohibited from withdrawing that option from the jury in a capital case.") *with Windham v. Merkle*, 163 F.3d 1092, 1106 (9th Cir. 1998)("Under the law of this circuit, the failure of a state trial court to instruct on lesser included offenses in a non-capital case does not present a federal constitutional question.").

Similarly, the Court had held that under the Due Process Clause:

> [e]very person has a fundamental right to liberty in the sense that the Government may not punish him unless and until it proves his guilt beyond a reasonable doubt at a criminal trial conducted in accordance with the relevant constitutional guarantees. But a person who has been so convicted is eligible for, and the court may impose, whatever punishment is authorized by statute for his offense, so long as that penalty is not cruel and unusual, and so long as the penalty is not based on an arbitrary distinction that would violate the Due Process Clause of the Fifth Amendment.

*Chapman v. United States*, 500 U.S. 453, 465, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991)(internal citations omitted).

Ultimately, petitioner's equal protection and due process claims fail here because defendants in capital cases are not similarly situated to defendants in non-capital cases. As such, Oregon's disparate treatment of these defendants is not based on an arbitrary distinction, but is rationally related to its purpose of allowing punishment of death in some cases. The State's disparate treatment, whether favorable or unfavorable, does not violate equal protection or due process principles. See Massie v. Hennessey, 875 F.2d 1386, 1389 (9th Cir. 1989)(In concluding that there was no equal protection violation in providing automatic appeal for murderers sentenced to death but not for murderers sentenced to life imprisonment, the court specifically held that capital and non-capital defendants are not similarly situated).

In *Wagner I*, the Oregon Supreme Court rejected an argument that enactment of Art. I, § 40 deprived defendants convicted of aggravated murder of protections under §§ 15 & 16 and to their constitutional rights under the equal protection clause. Identifying the issue as a federal question, that court determined that given § 40 was neither directed at a suspect class nor did it touch on a fundamental right explicitly or implicitly protected under the federal constitution, it need only be rationally related to its purpose to satisfy review under equal protection. It then

determined that § 40 was rationally related to its obvious purpose: "to allow punishment of death for certain unlawful homicides and to prevent review of death penalty statutes under sections 15 and 16." 305 Or. at 140-42, *vac'd and rem'd on other grounds*, 492 U.S. 914 (1989). In addition, in *Cunningham*, that court determined that the defendant failed to establish that he was entitled under the Fourteenth Amendment's due process clause to a statewide comparative sentence review. 320 Or. 47, 68 (1994)(citing *Pulley v. Harris*, 465 U.S. 37 (1984)).

Finally, petitioner's arguments notwithstanding, defendants do have an avenue of review to challenge death penalty charging decisions. *See, e.g., Farrar*, 309 Or. at 134-42 (Oregon Supreme Court reviews the question whether the district attorney engaged in an unfair selective prosecution in his decision to prosecute defendant for aggravated murder and his refusal to engage in plea negotiations); *State v. McDonnell*, 310 Or. 98 (1990)(Oregon Supreme Court remands case for an evidentiary hearing upon finding that the district attorney improperly delegated decision to enter into plea negotiations to victims' parents); *State v. Hayward*, 327 Or. 397, 403-04 (1998)(Oregon Supreme Court reviews the question of whether the Lane County District Attorney's office had a systematic policy for determining when to engage in plea negotiations in capital cases).

Based on the foregoing, the Court concludes that petitioner cannot demonstrate that the Oregon Supreme Court's denial of this subclaim was contrary to, or involved an unreasonable application of, clearly established Federal Law.

### L.    Fifteenth Claim:  Lack of a Sufficiently Complete Record to Allow Review

As a preliminary matter, respondent asserts that this claim is procedurally defaulted because petitioner failed to present it to the Oregon Supreme Court either on direct review or on

appeal from the Oregon Court of Appeals' denial of PCR relief. The Court's review of the record confirms this is the case. Accordingly, this claim is denied on the basis that is procedurally defaulted and petitioner cannot demonstrate entitlement to excuse the default. In addition, for the reasons that follow, even on *de novo* review the Court would conclude it is without merit.

Petitioner asserts that he has been denied due process and equal protection under the Fifth and Fourteenth Amendments because the state has not provided a sufficiently adequate record of his trial proceedings to allow aa constitutionally sufficient review of his convictions and death sentence. He highlights Oregon's practice of leaving the decision of which portions of a capital trial proceeding to make part of the record, including oral proceedings, to the discretion of the defendant's trial counsel. He insists this constitutionally flawed system specifically impacted his case as follows: (1) he did not receive the sealed juror questionnaires until October 13, 2016, some twenty (20) years after his direct appeal was complete, and, therefore, did not have the benefit of those questionnaires on direct appeal or during his PCR review; and (2) the transcription of the voir dire tapes (long ago destroyed) was haphazard and significant portions of the transcript are unintelligible. In sum, he maintains there was, and is, an insufficient record to allow for a constitutionally adequate review of his convictions and death sentence, and therefore, he is entitled to relief because it fails to meet heightened reliability requirements for capital trials under the Eighth and Fourteenth Amendments.

As an initial matter, respondent asserts that this claim is procedurally defaulted because petitioner did not present it to the Oregon Supreme Court on direct review or during his PCR proceedings. Moreover, even analyzing it as a facial challenge to Oregon's capital sentencing scheme, respondent insists it lacks merit because petitioner does not allege that Oregon law did

not allow for the preparation and retention of necessary parts of the record in a capital case, much less affirmatively prevent it.

Analysis

The Ninth Circuit has held that a petitioner bears the burden of establishing prejudice from the lack of a complete transcript and the availability of alternatives that would fulfill the same functions. *Madera*, 885 F.2d at 648-49; *see also*, *United States v. Wilson*, 16 F.3d 1027, 1031 (9th Cir. 1994)(when the court reporter failed to record all proceedings verbatim, the defendant had to demonstrate that specific prejudice resulted in order to obtain reversal).

At the heart of petitioner's facial challenges is his contention that Oregon's scheme fails to protect defendants' rights to an adequate record because it relies on trial counsel to request and obtain the record of the trial proceedings to allow for review of aggravated murder convictions and death sentences. Citing *Mayer v. City of Chicago*, 404 U.S. 189, 92 S.Ct 410, 30 L.Ed.2d 372 (1971) and *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963) for the importance of a complete state court record, he suggests that to pass constitutional muster Oregon's scheme had to provide that the state *automatically* provide the defense with the juror questionnaires and had to *automatically* retain tape recordings of voir dire for an indefinite time period.[28] However, *Mayer* indicates that defendants may or may not need a full verbatim record and references their ability to "make out a colorable need for a complete transcript." Coupled with the explicit

---

[28] Petitioner focuses on the destruction of the audio tapes, but it is unclear to the Court why, even if they were available, he believes efforts to transcribe them again would yield a better result. One can imagine that in the course of voir dire, with various prospective jurors answering questions, the recording did not clearly pick up portions of voir dire. In that case, efforts to fill in the gaps via say inquiry to court and counsel memory could have been accomplished with the transcripts themselves.

declaration that "[a] 'record of sufficient completeness' does not translate automatically into a complete verbatim transcript," *Mayer* rejects petitioner's contention that to be facially constitutional Oregon's scheme must require the state to produce and retain every component of the record petitioner complains of here, regardless of any request or showing on petitioner or his counsel's part. Similarly, while *Townsend* held that "[o]rdinarily [the complete state-court record]—including the transcript of testimony (or if unavailable some adequate substitute, such as a narrative record), the pleadings, court opinions, and other pertinent documents—is indispensable to determining whether the habeas applicant received a full and fair state-court evidentiary hearing resulting in reliable findings," a fair reading of that case does not lead to the conclusion that the state's burden to produce an adequate record of capital proceedings encompasses automatic production and indefinite retention of every component of the record that petitioner references here, regardless of any request or showing on petitioner's part, in order to be facially constitutional.

Instead, *Mayer* supports the notion that, depending on an individual defendant's circumstances, what constitutes a sufficient record will vary. That case does not stand for the proposition that uniformity in transcription, production, and retention of every aspect of trial is necessary for a scheme to be constitutional on its face.

Turning to the "missing" portions of the record petitioner identifies here, the Court concludes that he has not shown that Oregon's procedure for creating a record in a capital case either would not have permitted, or would have prevented, him from obtaining the juror questionnaires; or that it either would not have permitted, or would have prevented, him from pursuing efforts to fill in gaps or seek clarification related to the voir dire transcripts in accordance

with state law governing the re-creation of missing records necessary for appeal and for supplementing the record for appeal. *See e.g.*, *State v. Acremant*, 338 Or 302, 331-40 (2005).

The Court further concludes that he cannot demonstrate prejudice resulting from either the delay in his receiving the juror questionnaires or any deficiencies in the voir dire transcript. He contends that the unintelligible nature of the transcript prevents him from "carefully checking on whether religious or political grounds may have been asserted as the basis for a juror rejection, or what the real reasons may have been for the discharge of Prospective Juror No. 79 [Carol Davis]." He also suggests that there may be other issues buried in the unintelligible portions of the transcript. However, in an earlier Order [58], the Court addressed petitioner's assertion that the state's failure to make the juror questionnaires part of the appellate record should excuse the default of Claim Four, alleging the trial court wrongly discharged prospective jurors Nos. 4 (Ruth P. Williams) and 79 (Carol Davis) and that trial counsel was ineffective in in failing to object to the dismissal of these life-prone jurors. The Court also acknowledged that portions of the voir dire transcript, including sections related to Davis, were unintelligible and that a record of precisely why she was excused appeared to be missing altogether. Nevertheless, the Court found that there was a lack of any evidence in the record indicating that the trial court dismissed Davis based on her death penalty views, or even that it dismissed her for cause at all. To the contrary, I determined that the record showed that the trial court understood the requirements for death qualification and was determined to apply the correct legal standard.

Similarly, petitioner's suggestion that he was prejudiced by not having the juror questionnaires on direct appeal and during his pcr proceedings as set out in Claim Three is unavailing. As set out in the Court's resolution of this claim above, there is no merit to the

allegation that petitioner alone reviewed the questionnaires. While the Court is cognizant of the dilemma petitioner faces in trying to show prejudice as a result of the missing, mistaken or unintelligible portions of the voir dire transcript, it concludes that he has not met his burden of demonstrating by more than gross speculation that he was prejudiced by any gap in this record. As noted above, petitioner cannot prevail on this claim absent a specific showing of prejudice. He has failed to make that showing.

In addition, though petitioner argues that Oregon's scheme for creating the record on appeal is facially unconstitutional because trial counsel is tasked with making the record transcription decisions, he does not offer authority supporting the proposition that a *per se* conflict of interest arises between petitioners in Oregon and their counsel sufficient for me to determine Oregon's scheme is unconstitutional merely because it differs from those of other Ninth Circuit states and perhaps results in a less comprehensive record. In the absence of such authority, the Court declines to infer as a matter of law that a conflict of interest with counsel or some failure on counsel's part to perceive his or her own errors will result in a constitutionally insufficient record.

Finally, with regard to petitioner's suggestion that the Oregon courts engage as a matter of course in manipulation of the record including intentional removal of documents filed by capitally-charged defendants, the Court denies this claim for lack of support. *See James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994)("[c]onclusory allegations which are unsupported by a statement of specific facts do not warrant habeas relief").

For these reasons, the Court denies this claim as procedurally defaulted. Alternatively, on *de novo* review, the Court denies this claim on the merits.

## Certificate of Appealability

A petitioner seeking relief under §2254 may appeal a district court's dismissal of his federal habeas petition only after obtaining a certificate of appealability ("COA") from a district or circuit court judge. A certificate of appealability may issue only where a petitioner has made "a substantial showing of the denial of a constitutional right." See 28 U.S.C. §2253(c)(3). A petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). Under this standard, this Court concludes that reasonable jurists could find debatable whether this Court was correct in denying petitioner's claim alleging that counsel were ineffective in the penalty phase in their investigation and presentation of mitigating evidence. A certificate of appealability is granted with respect to Claim Thirteen of the Petition as it relates to counsel's investigation and presentation of mitigating evidence in the penalty phase.

## **CONCLUSION**

For the reasons stated above, the Court denies petitioner's petition for writ of habeas corpus and dismisses this action with prejudice, except for Claim Sixteen, which the Court previously dismissed without prejudice as premature. The Court grants a certificate of appealability with

respect to Claim Thirteen as it relates to counsel's investigation and presentation of mitigating evidence in the penalty phase.

IT IS SO ORDERED.

DATED this 13th day of May, 2021.

   /s/Ann Aiken
Ann Aiken
United States District Judge